[No. A042121. First Dist., Div. Three. Aug. 31, 1990.]

DARREN STEVENSON, Plaintiff and Appellant, v.
OCEANIC BANK, Defendant and Respondent.

COUNSEL

Mayo & Rogers and Terence O. Mayo for Plaintiff and Appellant.

Khourie, Crew & Jaeger, Eugene Crew, Peter J. Harris and John J. Steele for Defendant and Respondent.

OPINION

MERRILL, J.—In an action based on allegations of breach of contract, fraud and negligent misrepresentation, a jury found in favor of plaintiff Darren Stevenson (plaintiff) relative to the first and third causes of action, awarding him $1,051,258 in general damages. Thereafter, the trial court granted defendant Oceanic Bank's (Oceanic) motion for a judgment notwithstanding the verdict and, in the alternative, its motion for a new trial. Plaintiff appeals from the order granting these motions. Additionally, he appeals from an order designating Oceanic as the prevailing party in the action; awarding Oceanic $62,186.50 in attorney fees; and granting in part and denying in part his motion to tax costs. We affirm.

I

In 1983, plaintiff, an experienced businessman and salesman, decided to go into business with an individual by the name of Erwin Tullman (who is not a party to this suit). Tullman owned a number of companies at the time, one of which was Bahia Enterprise, Incorporated (Bahia). Bahia was a "shell" corporation with virtually no assets. Though incorporated in 1977, it had not been put into operation as yet. Plaintiff and Tullman planned to set Bahia up as an import company. Initial plans were to import shellfish from such places as the Orient and Mexico for local sales and distribution.

Tullman, who had experience in business of this nature, looked to plaintiff for financial backing. Plaintiff offered to use a large warehouse building in which he had a two-thirds ownership interest as collateral so that Bahia could obtain a line of credit from the bank. Additionally, plaintiff was to do sales work for the company. As part of the deal, plaintiff obtained close to half of the shares of stock in Bahia. Additionally, he became a director and officer of the company. Tullman remained president of the company. They agreed to split net profits evenly.

In May 1983, they approached defendant Oceanic to obtain financing for their venture. According to plaintiff, they sought an initial outlay of $20,000 as working capital plus a $180,000 line of credit. Oceanic granted Bahia a conditional line of credit, which conditions are set forth in a letter from the bank to plaintiff, dated May 25, 1983. Among the conditions cited in the letter are that plaintiff sign a continuing guaranty for $200,000 and that plaintiff provide Oceanic with a third deed of trust for $200,000 on the warehouse property. Another condition, condition "g," was that each letter of credit application was to be accompanied by either a purchase order or a bank-to-bank letter of credit. The obvious purpose of condition "g" was to minimize the risk to Oceanic, by requiring Bahia to obtain a purchase order from a consumer or a bank-to-bank letter of credit, before applying for money. The May 25 letter is signed by a vice-president of Oceanic and by plaintiff on behalf of Bahia.

Plaintiff and Tullman complied with the initial requirements of the agreement. Plaintiff gave Oceanic a third deed of trust to his property and signed the guaranty agreement. Two provisions of the guaranty agreement, paragraphs 4 and 8, are of particular note. Paragraph 4 of the guaranty agreement provides: "Guarantors authorize Bank, without notice or demand and without affecting their liability hereunder, from time to time to (a) renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the indebtedness or any part thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this guaranty or the indebtedness guaranteed, and exchange, enforce, waive and release any such security; (c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine; and (d) release or substitute any one or more of the endorsers or guarantors. Bank may without notice assign this guaranty in whole or in part." Paragraph 8 of the guaranty agreement states: "Where any one or more of Borrowers are corporations or partnerships it is not necessary for Bank to inquire into the powers of Borrowers or of the officers, directors, partners or agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder."

Three days following the execution of these documents, plaintiff and Tullman executed a "corporate resolution to borrow" on behalf of Bahia, which empowered either of the two men to borrow money from Oceanic unilaterally. A copy of the resolution was given to the bank.

In June 1983, following negotiations with the bank, plaintiff departed for Asia. Plaintiff says that the purpose of his trip was strictly "fact-finding" while Tullman says that the purpose was not only fact-finding but "negotiat[ing] purchases." Plaintiff and Tullman communicated fairly often by either telephone or telex, "[s]ometimes every other day," according to Tullman. During one of the telephone conversations, plaintiff gave Tullman some price quotes on shellfish which he had received from the Far East Cold Storage Company in Thailand (Far East). Tullman followed up by contacting Far East and requesting the quotes in writing. Upon receiving them, Tullman sent Far East a counteroffer which that company accepted. During the period he was negotiating with Far East, Tullman says he was in contact with plaintiff and that plaintiff approved the counteroffer. Plaintiff admits that he knew Tullman was planning to place an order of some kind. However, he says he thought that Tullman was ordering merely a sample of fish or if more, had initially obtained a purchase order for some fish. Plaintiff says under no circumstances was Tullman authorized to order fish without first obtaining a purchase order. It is plaintiff's position that Tullman never told him while he was abroad that he had actually placed an order for fish. According to plaintiff, it was not until he returned from his trip in July that he learned of the order from Far East.

In this regard the record on appeal includes two telex communications between plaintiff and Tullman. One dated June 20, 1983, is from Tullman and includes the following statements: "9. CONTACTED FAR EAST [AND] THAISERIE FOR TRIAL ORDER. FAR EAST REPLIED - GOOD PRICES[.] [¶] WILL OPN L/C. YOU SURE THE PRODUCT IS EXCELLENT? CAN THEY MAIL SAMPLE? L/C IS FOR ABOUT DLRS 130M." In response plaintiff sent Tullman a telex which said, among other things: "4. FAR EAST IS GOOD CO. YOU MUST LET ALL OF THEM KNOW THAT WE MUST COMPETE IN MKT. NEGOTIATE. [¶] 5. SURAPON HAS BEST QUALITY CONTROL. WE SHOULD BUY FROM BOTH[.] . . . [¶] 18. GET CONTAINER SHIPPED FROM THAILAND IF WE CAN SELL IT. PRICES ARE DROPPING[.]"

On June 24, 1983, Tullman submitted an application for a commercial letter of credit to Oceanic in the amount of $121,800 for the purpose of purchasing 950 cartons of prawns and 300 cartons of shrimp from Far East. The application is signed by Tullman. A shipping date of July 15, 1983, is listed for the merchandise. The application was not in compliance with condition "g" of the parties' loan agreement in that it was not accompanied

by either a purchase order or a bank-to-bank letter of credit. Nevertheless, Oceanic granted the application.

Thereafter, Far East was unable to meet the original shipping date. Accordingly, Tullman applied for two extensions of the letter of credit. Both of these applications for extensions occurred following plaintiff's return from his trip to Asia and, according to Tullman, were made with plaintiff's knowledge and approval. Plaintiff admits that he made no effort upon his return to rescind the order or the application for the letter of credit.

The shipment of fish finally arrived in August 1983. However, Bahia had difficulty selling it. Around this time, the shellfish industry was apparently flooded with an influx of fish from Mexico. It took the company over a year to sell the fish and when it did, it sustained a significant loss. In the meantime, other applications for letters of credit were submitted by plaintiff and Tullman to Oceanic in order to purchase other products. Plaintiff said he hoped to offset the losses from the sale of the shellfish with these other products. These applications were also granted even though they were not in compliance with condition "g." Oceanic continued to grant these applications until Bahia reached an indebtedness of approximately $200,000. After this, the bank required compliance with condition "g" before approving any further applications. Although Bahia was unable to recoup its losses in 1983 and 1984, the company managed to make interest payments on the loan. Accordingly, Oceanic continued to extend credit during this period.

In December 1984, plaintiff and Tullman severed their business relationship. Thereafter plaintiff took over the company. Not long after their breakup, Oceanic sent plaintiff a letter demanding payment of the loan. And in February 1985, Oceanic began legal proceedings to foreclose on plaintiff's warehouse property. The same month, it recorded a notice of default against the property as well. Plaintiff says that he was already attempting to sell his interest in the property when the foreclosure action was filed. Plaintiff asked Oceanic to postpone the legal proceedings so as to give him time to sell the property in order to pay the outstanding balance on the loan. Oceanic agreed to do this. Thereafter, plaintiff sold his interest in the property. He claims that because of the actions taken by Oceanic, he was forced to sell at a discounted price. Escrow closed on the property in October 1985. The following month, plaintiff paid Oceanic $259,293.19 from the proceeds of the sale. Around the same time, he closed the doors of Bahia.

Then in March 1986, plaintiff commenced the instant action against Oceanic. His complaint states three causes of action: breach of contract, negligent misrepresentation and fraud. Additionally, he seeks an accounting of the outstanding balance on the loan from Oceanic. The breach of

contract count is based on Oceanic's failure to enforce condition "g" of the loan and its failure to either advise plaintiff or obtain plaintiff's consent before waiving this condition; the negligent misrepresentation count is based on the allegation that Oceanic agreed to this condition of the loan without any reasonable belief that it would enforce it; and the fraud count is based on the allegation that Oceanic agreed to the condition knowing that it would not enforce it. Plaintiff claimed damages based on his payment of the outstanding balance of the loan, plus the sale of his interest in the warehouse property at a reported loss of close to $1 million.

The cause of action for an accounting was heard initially by the trial court. The court heard evidence from both sides and then settled the parties' account finding that Oceanic owed plaintiff $386.04 in interest.[1]

The remainder of the case proceeded to trial before a jury. Following trial, the jury returned a verdict awarding plaintiff general damages in the sum of $1,051,258 based on the causes of action for breach of contract and negligent misrepresentation. The jury found against plaintiff on the fraud count.

In granting Oceanic's motion for judgment notwithstanding the verdict, the court held that paragraph 4 of the parties' guaranty agreement constitutes an integration of the parties' understanding relative to any subsequent modifications of their underlying agreement, as a matter of law. Interpreting paragraph 4 based solely on its language, the court further found that that part of the provision authorizing Oceanic to, "without notice or demand . . . change the terms of the indebtedness," constituted advance consent by plaintiff to the bank's waiver of condition "g." Although the court permitted plaintiff to introduce extrinsic evidence at trial as to the meaning of paragraph 4, it said it found this evidence "legally irrelevant." It said that plaintiff's evidence to the effect that paragraph 4 did not authorize modification of the purchase order requirement contradicted the express language of the guaranty agreement. It held that the subject provision "is not reasonably susceptible" of such an interpretation. The court concluded that there was "no competent and legally relevant evidence" to support the jury's verdict relative to the causes of action for breach of contract and negligent misrepresentation. Additionally, the court determined in respect to the cause of action for negligent misrepresentation that the jury's verdict was unsupported by both the evidence and the law. It said, "Plaintiff's cause of action for negligent misrepresentation cannot be maintained absent

---

[1] The record indicates that upon the sale of plaintiff's property, Oceanic received $259,293.19 out of escrow. However, the bank later returned $18,134.73 to plaintiff as an overpayment. The $386.04 in interest awarded to plaintiff by the court represents interest on the amount plaintiff overpaid.

proof the bank misrepresented its capability to perform when it knew or should have known there were no safeguards to prevent letters of credit from being issued without purchase orders. As there was no substantial evidence of this fact, the jury's verdict on the third cause of action was unsupported by the evidence and cannot stand."

The trial court granted a new trial in the alternative in case the judgment notwithstanding the verdict is overturned on appeal. In granting the new trial, the court said that the damages awarded by the jury were excessive and the verdict in general was contrary to both the law and the evidence.

Thereafter, Oceanic filed a memorandum of costs and disbursements itemizing costs of $118,549.93; followed by a motion for attorney fees in the sum of $104,732.75; with a request for a determination that it is the prevailing party in the suit. Plaintiff opposed Oceanic's motion and brought his own motion to tax costs. Plaintiff requested that the court strike from Oceanic's memorandum $574.80 in computer-related costs and $11,310.28 in miscellaneous costs. The trial court determined that Oceanic is the prevailing party. It then awarded Oceanic $62,186.50 in attorney fees. It granted plaintiff's request to strike miscellaneous costs of $11,310.28 and denied plaintiff's motion in all other respects.

## II

Preliminarily, we note the standard of review as relates to the judgment notwithstanding the verdict.

■ "The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. [Citations.] The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].)

Keeping these guidelines in mind, we proceed with our review of the judgment notwithstanding the verdict first as it relates to the cause of action

based on an alleged breach of contract, then as it relates to the cause of action based on alleged negligent misrepresentation.

### III

 The judgment notwithstanding the verdict relative to the breach of contract count is based on the trial court's interpretation of two documents: First, the May 25 letter from Oceanic to plaintiff, which itemizes the terms and conditions of the loan to Bahia including condition "g" providing that each letter of credit application is to be accompanied by a purchase order or bank-to-bank letter of credit. The second document consists of the guaranty agreement between Oceanic and plaintiff. Of particular importance here is paragraph 4 of that agreement which discusses the bank's right to change the "terms of indebtedness" in the underlying loan.

Based on all of the evidence, the trial court determined that the May 25 letter represents strictly the loan agreement between Oceanic and Bahia. It does not represent any agreement between Oceanic and plaintiff personally. Plaintiff's involvement in the agreement is solely in his capacity as an officer of the company. Accordingly, plaintiff's personal claim of a breach of contract by Oceanic must be based on the guaranty agreement, not the loan agreement.

As relates to the guaranty agreement, the court found that the agreement constitutes an integrated writing. It found extrinsic evidence introduced by plaintiff to prove otherwise incompetent. After making this determination, the court interpreted the agreement based solely on the language contained therein. In doing so, it found that Oceanic had not breached the guaranty agreement in waiving condition "g" of the underlying loan agreement with Bahia. The court found that the bank was authorized to do this by paragraph 4 of the guaranty agreement.

 In terms of our review, we note the following applicable rules of law: "It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) Accordingly, "An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citation], or a determination has been made upon incompetent evidence [citation]. Under these circumstances, there is no issue of fact, and it is the duty of an appellate court to make the final determination in accordance with the applicable principles of law." (*Estate of Platt* (1942) 21 Cal.2d 343, 352 [131 P.2d 825].)

■ As pertains to the May 25 letter, it is apparent from the letter itself that it constitutes a statement of the terms of the loan agreement between Oceanic and Bahia and nothing more. The letter addresses itself to plaintiff solely in his capacity as a corporate officer. The text of the letter states, "Oceanic Bank is pleased to provide *Bahia Enterprise Inc.* a line of credit under the following terms and conditions." (Italics added.) After setting out the terms and conditions, the letter closes by saying, "Should these terms and conditions be satisfactory *to your company,* please indicate your acceptance by signing and returning the duplicate copy of this letter. Upon receiving your acceptance, I will start the necessary paperwork." (Italics added.) The letter is then signed by a vice-president and senior credit officer of Oceanic. Plaintiff's signature and title as director of Bahia appear following the words: "ACCEPTED: [¶] BAHIA ENTERPRISE INC."

And there is nothing in the evidence to indicate that the document is anything other than an agreement between Oceanic and Bahia. It is indisputable that the line of credit extended by Oceanic ran solely to Bahia and not to plaintiff or Tullman individually. This is the way the two men structured the transaction. This is the way they set up the original loan application and all loan applications that followed. While plaintiff wore two hats in the transaction, that of a corporate officer and that of the guarantor, these roles were clearly defined and differentiated by the parties by way of their documents—i.e., the loan application, the May 25 loan agreement and the guaranty agreement. The lines are not blurred, contrary to plaintiff's statements otherwise.

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) ■ Generally speaking, "[T]he rules of interpretation of written contracts are for the purpose of ascertaining the meaning of the *words used* therein; evidence cannot be admitted to show intention independent of the instrument. [Citations.]" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 684, pp. 617-618.)

■ Next, as relates to the court's finding that the guaranty agreement is an integrated agreement between the parties, we find no error. ■ "It has been hornbook law since *Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561], that whether or not a written agreement is 'integrated,' i.e., expresses the entire agreement of the parties, depends on the parties' intent, which must be resolved by consideration of relevant extrinsic evidence that explains *but does not flatly contradict the writing.* [Citation.] The question of integration must be resolved preliminarily by the court, not a jury, and only after the court finds the agreement not integrated

may parol evidence be admitted to amplify its terms. [Citation.] . . . An important consideration on the issue of integration is whether a claimed collateral agreement involves terms that would 'naturally' have been included in the writing. [Citations.]" (*Mobil Oil Corp.* v. *Handley* (1978) 76 Cal.App.3d 956, 961 [143 Cal.Rptr. 321], italics added.)

 It is apparent from the record that the basis of plaintiff's contract claim was really the loan agreement and not the guaranty agreement. But when the trial court ruled that plaintiff could not base a personal contract claim on the loan agreement, plaintiff attempted to accommodate the ruling by alleging a collateral oral agreement between the parties to incorporate condition "g" into the guaranty agreement as well. In essence, plaintiff claimed that his guaranty of the underlying loan between Oceanic and Bahia was based, in part, on an agreement between himself and the bank that no loan application would be granted absent a purchase order covering the amount of the debt and, further, that this condition of the loan would not be waived by Oceanic absent plaintiff's prior consent.

The trial court properly admitted plaintiff's evidence on the question of integration, as evidence of the circumstances surrounding the execution of the guaranty agreement. (See *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 225-228 [65 Cal.Rptr. 545, 436 P.2d 561].) It then properly rejected this evidence as "directly contradict[ory]" to the express terms of the guaranty agreement. (*Id.*, at p. 227.)

It will be remembered that paragraph 4 of the guaranty agreement authorized Oceanic "without notice or demand" to "change the terms of the indebtedness or any part thereof" in the underlying loan agreement. And paragraph 1 of the guaranty agreement defines what is meant by the term "indebtedness" as follows: "The word 'indebtedness' is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrowers or any one or more of them, heretofore, now, or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether direct or acquired by Bank by assignment or succession, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Borrowers may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter become barred by any statute of limitations, or whether such indebtedness may be or hereafter become otherwise unenforceable."

Even assuming plaintiff's evidence to be true, it is clear that an incorporation of condition "g" into the guaranty agreement along with the requirement that Oceanic obtain plaintiff's consent before waiving said condition,

would "flatly contradict" the express terms of the guaranty agreement. (*Mobil Oil Corp.* v. *Handley, supra,* 76 Cal.App.3d at p. 961.) Indeed, such an incorporation is so incongruous with the agreement as a whole as to be the type of thing that "would 'naturally' have been included in the writing," had the parties so intended. (*Ibid.*) Accordingly, we find the trial court's determination that plaintiff's evidence was inadmissible and incompetent on the question of integration, to be valid as a matter of law, as is its additional finding that the guaranty agreement is an integrated writing.

Similarly, we find the court's ruling excluding the same evidence for purposes of interpreting the guaranty agreement valid as well. As stated by the trial court, "Paragraph four is not reasonably susceptible of the interpretation advanced by plaintiff." (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

And in interpreting the guaranty agreement based solely on its language, we concur with the trial court that Oceanic was authorized under paragraph 4 of the guaranty agreement to waive condition "g" without plaintiff's prior approval.

## IV

Plaintiff next challenges the trial court's finding that paragraph 4 of the guaranty agreement does not constitute a contract of adhesion. We are in agreement with the court's ruling.

■ "The term 'contract of adhesion' signifies a standardized contract which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it. [Citation.] A contract of adhesion is unenforceable [when] it defeats the reasonable expectation of the adhering party [citations] . . . . [A] guaranty is not a contract of adhesion. As explained in *Oakland Bank of Commerce* v. *Washington* (1970) 6 Cal.App.3d 793, 799 [86 Cal.Rptr. 276]; 'This rule [relating to contracts of adhesion] has been applied to such matters as exceptions to reasonably expected coverage in insurance policies [citations]; clauses exculpating a title insurance company from the consequences of its own negligence [citation]; and limitations on city employees' pensions [citation], wherein the matter was of quasi-public policy and one of the parties had reduced bargaining power in entering into a standardized contract prepared by the other party. In such case, the exception, exclusion or limitation must be expressed in such conspicuous form as to draw attention of the ordinary person entering the contract. But in this case the contract of guaranty, in its essential parts, is in positive

form, that is, it creates a liability, it does not limit a liability of the preparer of the contract.' [Citation.]" (*Security Pacific National Bank* v. *Adamo* (1983) 142 Cal.App.3d 492, 497-498 [191 Cal.Rptr. 134].)

There is no evidence in the case at bar that the guaranty agreement between plaintiff and Oceanic is an adhesion contract. At the time plaintiff entered the agreement, he could have negotiated for the removal of paragraph 4 or some modification of it. The record does not evidence any inequality of bargaining power. Bahia and plaintiff were not faced with a distress situation and were free to "shop around" for a different arrangement. Instead, plaintiff signed the agreement intact. (See *Union Bank* v. *Ross* (1976) 54 Cal.App.3d 290, 295-296 [126 Cal.Rptr. 646].)

V

■ The next issue raised by plaintiff is the granting of the judgment notwithstanding the verdict as to the cause of action of his complaint alleging negligent misrepresentation. Plaintiff based this cause of action on the following alleged representations by Oceanic: its intention to enforce condition "g" of the loan agreement and the fact that it possessed the necessary administrative resources and procedures to do so. The trial court found the first part of plaintiff's argument nonactionable as a matter of law. The court further found that there is insufficient evidence to support a finding that Oceanic misrepresented its capability to enforce condition "g" when it knew or should have known that it did not have adequate administrative procedures in place in order to do so. We find no error in the trial court's findings.

As already established, condition "g" was not a part of the guaranty agreement between Oceanic and plaintiff, but solely the loan agreement between Oceanic and Bahia. Accordingly, any cause of action based on this provision would have to be brought by Bahia, and cannot be stated by plaintiff personally. Plaintiff's cause of action for negligent misrepresentation fails on this basis alone.

Furthermore, Bahia itself would be estopped from stating such a cause of action based on its conduct in the loan transactions. On several occasions Bahia obtained loans from Oceanic on the basis of applications that were not in compliance with condition "g." These applications were submitted by either plaintiff or Tullman, each of whom was authorized under the corporate resolution to borrow, and to submit such an application. It was only after the company had received over $200,000 in credit and the bank decided to enforce condition "g," that Bahia finally complied. Such conduct, we hold, constitutes a waiver by Bahia of the subject provision as a condition of

the loan. The company benefitted from the bank's flexibility in enforcing condition "g" and, consequently, is not in a position to complain.

## VI

■ Plaintiff's final claim of error is based on the determination that Oceanic is the prevailing party in the case for purposes of awarding costs and attorney fees pursuant to Code of Civil Procedure section 1032 and Civil Code section 1717. We find no error in the trial court's ruling.

Code of Civil Procedure section 1032 provides for recovery of costs by the "prevailing party" as a matter of right. Subdivision (a)(4) of the statute states that the term includes "the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties on the same or adverse sides pursuant to rules adopted under Section 1034."

Civil Code section 1717, meanwhile, provides for an award of attorney fees to the prevailing party in certain contract actions. The pertinent part of this provision provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. . . . [¶] (b)(1) . . . Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section."

In the case at bar, the guaranty agreement includes a clause stating that the guarantor, in this case plaintiff, agrees to "pay a reasonable attorney's fee and all other costs and expenses which may be incurred by Bank in the enforcement of this guaranty."

Plaintiff's primary cause of action in the instant case was for breach of contract based on the guaranty agreement. There can be no question but that plaintiff lost on that count. Nevertheless, plaintiff maintains that he is the "party with a net monetary recovery" based on the fact that the court

awarded him $386.04 in interest in the accounting cause of action which he says is related to the count alleging a breach of contract.

Even assuming for the sake of argument that the accounting cause of action is sufficiently related for this purpose, plaintiff's argument still fails. The court's ruling in the accounting matter was that Oceanic is entitled to $239,684.35 in principal and interest while plaintiff is due only $386.04 in interest. Clearly, Oceanic is the prevailing party as to this cause of action as well. (See *Syverson* v. *Heitmann* (1985) 171 Cal.App.3d 106, 110-112 [214 Cal.Rptr. 581]; *Ferraro* v. *Southern Cal. Gas Co.* (1980) 102 Cal.App.3d 33, 52-53 [162 Cal.Rptr. 238].)

## VII

The order granting the judgment notwithstanding the verdict is affirmed. Also affirmed is the order designating Oceanic as the prevailing party in the action, awarding Oceanic $62,186.50 in attorney fees, and granting in part and denying in part plaintiff's motion to tax costs.

Our affirmance of the judgment notwithstanding the verdict renders the alternative order granting Oceanic a new trial ineffective and, consequently, we do not reach the issues raised by plaintiff in regard to that order. (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 444, pp. 438-439.)

White, P. J., and Strankman, J., concurred.

A petition for a rehearing was denied October 1, 1990, and appellant's petition for review by the Supreme Court was denied December 19, 1990.