[No. D013555. Fourth Dist., Div. One. Mar. 23, 1992.]

ROBERT S. WINET, Cross-complainant and Appellant, v.
WILLIAM E. PRICE, Cross-defendant and Respondent.

**COUNSEL**

Chapin, Fleming & Winet, George E. Fleming and Shirley A. Banner for Cross-complainant and Appellant.

Keesal, Young & Logan, Robert H. Logan and Dawn M. Schock for Cross-defendant and Respondent.

## OPINION

**FROEHLICH, J.**—We are presented in this case with an agreement releasing all claims against a party, including unknown and unsuspected claims, and reinforcing such release by specifically referring to and waiving the benefits of the provisions of Civil Code[1] section 1542. The issue is whether this release can be avoided if the releasor testifies he was unaware of a claim and did not intend to waive the right to pursue that claim. Appellant Robert S. Winet (Winet) argues the answer is yes, while respondent William E. Price (Price) contends the answer is no. The trial court agreed with Price and terminated Winet's attempt to pursue the alleged claim by entering summary judgment based on the release.

We conclude it is possible for a general release to effectively accomplish its primary purpose: to enable parties to end their relationship and permanently terminate their mutual obligations. On the record before us, we conclude the present release accomplishes that goal, and we therefore affirm.

### I. Factual Background

#### A. The Genesis of the Release

The material facts are undisputed. During the period from 1973 to early 1975, Price, an attorney, performed legal services for Winet and Winet's various legal entities. Among the legal services Price performed was the drafting of a partnership agreement for an entity known as Newark Storage Partners, Ltd. (hereinafter referred to as the Newark partnership). Winet was the general partner of the Newark partnership.

A dispute eventually arose between Winet and Price over legal fees owed by Winet.[2] Accordingly, in 1975, Price's law firm, Price & Elster, filed an action to collect its fees from Winet, alleging Winet owed it over $20,000. The matter was eventually settled and a general release signed as part of that settlement. The scope and enforceability of that release concerns us here.

#### B. The Release

The general release, which named (among others) Price and Winet as releasing parties, provided for a release of "any and all . . . claims, . . .

---

[1] All statutory references are to the Civil Code unless otherwise specified.

[2] From 1973 through mid-1974 Price was a principal officer and shareholder in the law firm of Shenas, Robbins, Shenas & Price. From mid-1974 through 1975 Price was a principal officer and shareholder in the law firm of Price & Elster. Winet apparently owed fees to both firms, although only Price & Elster chose to file a lawsuit to collect its fees.

damages and causes of action whatsoever, of whatever kind or nature, *whether known or unknown, or suspected or unsuspected . . .* against any other Party . . . ." (Italics added.) The release of all "known or unknown, or suspected or unsuspected" claims also specifically included all claims arising:

"(a)   By reason of any matter or thing alleged or referred to, or directly or indirectly or in any way connected with or arising out of or which may hereafter be claimed to arise out of all or any of the matters, facts events or occurrences alleged or referred to in any of the pleadings on file in [the Price v. Winet collection action].

"(b)   Arising out of or in any manner connected with the performance of legal services by [Price or his law firms] for [Winet or his entities], or any act or omission by any Party in connection with said legal services or any request for the performance of legal services.

"(c)   Arising out of or in any way connected with any loss, damage, or injury whatsoever, known or unknown, suspected or unsuspected, resulting from any act or omission, by or on the part of any Party, committed or omitted prior to the date hereof."

The parties did specifically except from their agreement any claims connected with "any act or omission committed or omitted relating to Canoga Storage Partners, Ltd. . . ." (Release, [¶] (d)), but made no similar exception for the Newark partnership. The parties then reaffirmed that their agreement included unknown or unsuspected claims, declaring:

"All Parties to this Mutual General Release do hereby further agree as follows:

"(1)   There is a risk that subsequent to the execution of this Mutual General Release, one or more Parties will incur or suffer loss, damages or injuries which are in some way caused by the transactions referred to above, but which are unknown and unanticipated at the time this Mutual General Release is signed.

"(2)   All Parties do hereby assume the above-mentioned risks and understand that this Mutual General Release SHALL APPLY TO ALL UNKNOWN OR UNANTICIPATED RESULTS OF THE TRANSACTIONS AND OCCURRENCES DESCRIBED ABOVE, AS WELL AS THOSE KNOWN AND ANTICIPATED, and upon advice of legal counsel, all Parties do hereby waive any and all rights under California Civil Code § 1542, which section has been duly explained and

reads as follows: [¶] 'A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release . . . .' "

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"(4)   The advice of legal counsel has been obtained by all Parties prior to signing this Mutual General Release. All Parties execute this Mutual General Release voluntarily, with full knowledge of its significance, and with the express intention of effecting the legal consequences provided by [section 1541], i.e., the extinguishment of all obligations."

Winet was represented by legal counsel during the negotiation of the release.

### C.   *The Present Lawsuit*

Nearly 15 years later, some of the limited partners in the Newark partnership sued Winet. The lawsuit sought damages against Winet for breaching his duties as general partner. It also sought declaratory relief and reformation because certain ambiguous language in the Newark partnership agreement did not accurately reflect the agreement or conform to the representations upon which the limited partners relied when they purchased their interests. Winet then cross-complained for contribution and indemnity against Price, alleging that Winet's liability to the plaintiffs, if any, was caused by Price's malpractice in drafting the partnership documents.

Price subsequently moved for summary judgment, arguing that the release was unambiguous and barred any claim by Winet against Price because the claim arose out of the Newark partnership agreement, which the general release encompassed. Winet opposed the motion, arguing summary judgment was inappropriate because there was a disputed issue of "fact," i.e., whether the release covered the present claim. In opposition to the summary judgment motion, Winet submitted his own declaration stating, in pertinent part, that when he signed the release he did not intend to waive all possible disputes with Price over Price's legal services, and that he was unaware at the time he signed the release of the possibility of the present action.

The trial court granted summary judgment, concluding that the release was broadly designed to bar all claims of malpractice arising out of Price and Winet's relationship, that it was specifically negotiated with the help of counsel, and that the significance of Winet's waiver of section 1542 was explained and understood by the parties. Winet appeals.

Our independent review of the language of the release convinces us that it does encompass the claims sued upon here, and we therefore affirm.

## II.  *Standard of Review*

The sole issue here is whether the trial court correctly interpreted the written release as barring Winet's claim against Price. ■  Because the interpretation of a settlement agreement is governed by the same principles applicable to any other contractual agreement (see, e.g., *Edwards* v. *Comstock Insurance Co.* (1988) 205 Cal.App.3d 1164, 1167-1169 [252 Cal.Rptr. 807]), we briefly outline the standards applicable to appellate review of a trial court's interpretation of a contract.

We begin by noting the oft-stated rule that parol evidence is properly admitted to construe a written instrument when its language is ambiguous. The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is "reasonably susceptible." (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. (*Blumenfeld* v. *R. H. Macy & Co.* (1979) 92 Cal.App.3d 38, 45 [154 Cal.Rptr. 652].)

■  Different standards of appellate review may be applicable to each of these two steps, depending upon the context in which an issue arises. The trial court's ruling on the threshold determination of "ambiguity" (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. (*Madison* v. *Superior Court* (1988) 203 Cal.App.3d 589, 598 [250 Cal.Rptr. 299].) Thus the threshold determination of ambiguity is subject to independent review. (*Equitable Life Assurance Society* v. *Berry* (1989) 212 Cal.App.3d 832, 840 [260 Cal.Rptr. 819].)

The second step—the ultimate construction placed upon the ambiguous language—may call for differing standards of review, depending upon the

parol evidence used to construe the contract. When the competent parol evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence. (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1084 [258 Cal.Rptr. 721].) However, when no parol evidence is introduced (requiring construction of the instrument solely based on its own language) or when the competent parol evidence is not conflicting, construction of the instrument is a question of law, and the appellate court will independently construe the writing. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

■ In this case we are not bound by the trial court's interpretation, because (1) the threshold determination of "ambiguity" is always subject to de novo review, and (2) the competent extrinsic evidence introduced in this case was not in conflict.[3] Accordingly, we do not defer to the trial court's interpretation of the disputed phrase but independently construe the writing to determine whether the release encompasses the present claim.

### III. The Language of the General Release Shows the Parties Intended to Encompass All Known and Unknown Claims

■ Our objective in construction of the language used in the contract is to determine and to effectuate the intention of the parties. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.*, *supra*, 69 Cal.2d at p. 38.) It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce. (See, e.g., *Edwards* v. *Comstock Insurance Co.*, *supra*, 205 Cal.App.3d at p. 1169.)

It is appropriate to begin this investigation with a review of the literal terminology of the contract. (§§ 1638, 1639.) In no fewer than three distinct places the parties declared their intention to release each other from *all* claims, known or unknown, suspected or unsuspected, arising from either the facts described in the collection lawsuit (which included drafting the partnership agreement Winet now claims was inadequately documented) or any

---

[3]Although Winet argues there were disputed "facts," the only evidence which was in "conflict" was Winet's testimony as to what he subjectively understood and intended the release to encompass. While this "subjective intent" evidence was conflicting, it was not *competent* extrinsic evidence, because evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language. (*Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; *Blumenfeld* v. *R. H. Macy & Co.*, *supra*, 92 Cal.App.3d at p. 46.) Nor does the fact that the parties claimed there were conflicting *inferences* to be drawn from the facts preclude de novo review: Where the evidentiary facts are undisputed, and only the inferences to be drawn therefrom are disputed, an appellate court must independently construe the written language. (*Parsons* v. *Bristol Development Co.*, *supra*, 62 Cal.2d at p. 866, fn. 2; *Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 816 [250 Cal.Rptr. 220].)

act or omission in connection with the legal services Price rendered to Winet. Moreover, lest this repeated attempt to reinforce their declared intent be deemed inadequate, the parties reiterated that (1) there was a risk they might suffer losses unknown or unanticipated at the time of the release; (2) they were represented by counsel, who advised them of the rights conferred by section 1542; and (3) with knowledge of the risks, and upon advice of counsel, the parties assumed the risks of unknown or unanticipated claims, and agreed ". . . that this Mutual General Release SHALL APPLY TO ALL UNKNOWN OR UNANTICIPATED RESULTS OF THE TRANSACTIONS AND OCCURRENCES DESCRIBED ABOVE, AS WELL AS THOSE KNOWN AND ANTICIPATED. . . ."

■ Despite this strong, clear effort to iterate and reiterate that the release applied to *all* claims, Winet, citing *Vega* v. *Western Employers Ins. Co.* (1985) 170 Cal.App.3d 922 [216 Cal.Rptr. 592], argues that whether a specific later-discovered claim was intended to be covered by a broad release can *always* be made a disputable issue of fact. There is a dispute in this case, Winet claims, because his proffered parol evidence indicates an intention contrary to the literal meaning of the words of the release.

We note, first, that the parol evidence tendered by Winet is his uncommunicated subjective intent as to the meaning of the words of the contract. Winet does not suggest that he ever communicated to Price or his attorney his intent to retain the right to sue Price in the future.[4] Further, parol evidence is admissible only to prove a meaning to which the language is "reasonably susceptible" (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.*, *supra*, 69 Cal. 2d at p. 38), not to flatly contradict the express terms of the agreement. (*Stevenson* v. *Oceanic Bank* (1990) 223 Cal.App.3d 306, 317-318 [272 Cal.Rptr. 757].) Winet's evidence violates this tenet, because it seeks to prove that a release of unknown or unsuspected claims was *not* intended to include unknown or unsuspected claims. If an argument such as this were given currency, a release could never effectively encompass unknown claims. A releasor would simply argue that a release of unknown or unsuspected claims applied only to known or suspected claims, making it ineffective as to unknown or unsuspected claims.

Since there is no evidence of the parties' discussions at the time the release was negotiated, there remain only the surrounding circumstances

---

[4] It is on this basis that we distinguish our recent decision in *Asare* v. *Hartford Fire Ins. Co.* (1991) 1 Cal.App.4th 856 [2 Cal.Rptr.2d 452]. In *Asare*, a workers' compensation release form which released all claims was held inapplicable to a later title VII discrimination lawsuit. However, the evidence in *Asare* suggested that the attorneys for the parties *expressly discussed* the issue of whether the release would apply to the title VII claim and agreed it would not. Here, however, there is no evidence that any discussion was held, much less an agreement made, intending that the scope of the release would not encompass future malpractice claims.

from which to interpret the language of the contract. We are instructed to consider parol evidence of the circumstances which attended the making of the agreement, " '. . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.]" (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 40.) Review of the circumstances confirms our interpretation that the release was designed to extinguish all claims extant among the parties. First, Winet was represented by counsel and was aware at the time he entered into the release of possible malpractice claims against Price relating to certain services Price had rendered to him.[5] With this knowledge and the advice of counsel concerning the language of (and the import of waiving) section 1542, Winet expressly assumed the risk of unknown claims. Second, it is significant that the parties were able to, and did, fashion language memorializing their agreement to preserve identified claims from the operation of the release when such was their intention, specifically, the Canoga Storage Partners, Ltd. malpractice claim exclusion. Finally, Winet was represented by his own counsel, who explained to Winet the import of the release in general and of the waiver of section 1542 in particular. Under these circumstances we may not give credence to a claim that a party did not intend clear and direct language to be effective. (*Bodle* v. *Bodle* (1978) 76 Cal.App.3d 758, 764 [143 Cal.Rptr. 115] ["Where a formal contract has been prepared by persons learned in the law, the words should be given their ordinary legal import."].)

We are guided in this conclusion by the comments of the court in *Edwards* v. *Comstock Insurance Co., supra,* 205 Cal.App.3d 1164, which rejected a releasor's attempt to escape a comprehensive release by claiming it was not releasor's intention to release the defendant from all claims. The court explained:

"Appellants urge us to interpret the plain language in their release agreements discharging respondents from 'any and all claims . . .' to mean 'all claims except for bad faith . . .' Under the circumstances presented here, we decline to rewrite appellants' release agreements to include a concept they failed to enunciate at the time they accepted the terms of the settlement with their insurer.

" 'The general rule is that when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and

---

[5]Specifically, Winet had submitted a declaration in the original Price v. Winet action describing his intent to file a cross-complaint for losses he suffered as a result of the alleged malpractice by Price. Although that claim of malpractice involved different acts and omissions from those alleged in connection with the Newark partnership, it is clear that Winet and his counsel were aware of the right to seek compensation for malpractice as well as for the possible inferior quality of Price's services.

imposition, bound by its contents, and is estopped from saying that its provisions are contrary to his intentions or understanding . . . .' [Citation.] . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Appellants] presented no evidence showing that they labored under any physical or mental disability . . . . Nor did they declare that they were unable to comprehend the plain language of the release agreement. There was no evidence indicating that . . . they were not dealing at arm's length when they negotiated the settlement and release. . . .

"In light of the circumstances we have described above, we agree with the trial court that parol evidence of [appellants'] undisclosed intention . . . is inadmissible to contradict a release in which [they] unambiguously relinquish their right to pursue *all* claims . . . ." (205 Cal.App.3d at pp. 1167-1169.)

### IV. *The Authorities Which Permit a Party to Avoid the Terms of a Comprehensive Release Have No Application Here*

Winet relies on two cases for the proposition that, notwithstanding the comprehensive language of the present release, he is entitled to attempt to prove the parties did not intend the release to extend to unknown claims.[6] Our review of these cases, however, shows they are factually or legally distinct and provide Winet no basis for escaping from his agreement.

Winet first relies on *Casey* v. *Proctor, supra,* 59 Cal.2d 97. In *Casey,* the releasor signed a form release sent to him by an insurance adjuster. The release was signed a few days after the accident, and the releasor had no legal counsel. At the time the release was signed, the releasor had not sought any medical advice and believed he had sustained no injuries other than property damage. The release extended to all "known and unknown" bodily injuries and property damages, but contained no specific waiver of the protections of section 1542. (59 Cal.2d at pp. 100-102.)

---

[6]We are cognizant of the many cases which have permitted litigants to avoid the terms of a comprehensive general release. There are, of course, those cases in which the releasor was allowed to avoid a comprehensive general release because the courts concluded that when he signed the release he lacked the mental capacity to fully understand the nature and import of the document he was signing. (See generally, *Kostick* v. *Swain* (1953) 116 Cal.App.2d 187, 192-196 [253 P.2d 531] [review of cases in which mental/physical disabilities permitted releasor to rescind release].) Similarly, there are cases in which the courts allowed rescission of a comprehensive release because the releasee had obtained the signature of the releasor through fraud, deception, overreaching or other unfair conduct. (See *Casey* v. *Proctor* (1963) 59 Cal.2d 97, 102-104 [28 Cal.Rptr. 307, 378 P.2d 579] [catalog of cases allowing rescission based on unfair conduct].) Neither line of cases applies here.

The court concluded the intent of section 1542 was to prevent a releasor from inadvertently waiving unknown claims merely by signing a general release. (*Casey* v. *Proctor, supra,* 59 Cal.2d at pp. 108-109.) The court went on to explain, however, that its interpretation of section 1542 ". . . *does not prevent all settlements for unknown claims. It was never intended to do so.* Rather, its purpose was to prevent the *mere recital* in the release to that effect from barring a claim for injuries later discovered *in the absence of a showing of a conscious understanding* that if injuries were suffered which had not yet manifested themselves, they too would be discharged by the release." (59 Cal.2d at p. 109, italics added.)

Moreover, the *Casey* court recognized there are competing policy concerns peculiarly applicable to personal injury releases. While there is a desire to encourage finality in settlements, there are also countervailing concerns, such as (1) the difficult process of evaluating long-term effects of personal injuries, leaving the unfortunate claimant bearing the loss, with the insurer reaping a windfall through avoidance of liability for a risk it had been paid to assume, and (2) the adhesive nature of a form release presented to a claimant on a "take it or leave it" basis. These concerns ". . . warrant special treatment of releases for personal injuries . . . ." (*Casey* v. *Proctor, supra,* 59 Cal.2d at pp. 111-112.)

The factual and legal distinctions render *Casey* inapplicable to the present case. This case does not involve personal injuries; it involves ordinary business relations. (See, e.g., *Brae Transp., Inc.* v. *Coopers & Lybrand* (9th Cir. 1986) 790 F.2d 1439, 1444-1445 [declines to apply rationale of personal injury cases to commercial release].) Nor does this case involve an unsophisticated claimant who is presented with a form release on a "take it or leave it" basis and signs the release without the benefit of counsel, conferring a windfall on an insurance company. To the contrary, Winet appears to be a sophisticated businessman who, with the benefit of counsel, specifically negotiated the subject release in an arm's-length transaction.

Most importantly, *Casey* is inapplicable because its holding rested principally upon the court's conclusion that the purpose behind section 1542 was to prevent inadvertent waivers of unknown claims by a ". . . *mere recital* in the release to that effect . . ." (*Casey* v. *Proctor, supra,* 59 Cal.2d at p. 109, italics added), but that such waivers *would* be binding upon a showing the parties consciously understood and agreed such was the effect of their release.[7] (59 Cal.2d at pp. 109-110.) Here, unlike *Casey*, Price does not merely seize upon an oblique reference to "all known and unknown" claims

---

[7]Winet claims that, under *Casey*, the parties' intent to include unknown claims is *always* a question of fact for the jury, and can *only* be shown by evidence "independent of the words of

to show the parties intended the release to be comprehensive in derogation of section 1542. The release shows Winet consciously *understood* the benefits conferred by section 1542 and the risks assumed by the release, and, after receiving counsel's advice, consciously waived such benefits and entered the agreement ". . . voluntarily, with full knowledge of its significance, and with the express intention of effecting the legal consequences provided by [section 1541], i.e., the extinguishment of all obligations." In short, the concerns expressed in *Casey* are simply absent here.

Winet also relies on *Vega v. Western Employers Ins. Co., supra*, 170 Cal.App.3d 922. In *Vega*, a claimant injured in a vehicle accident sued the driver and owner of the offending vehicle, recovering a judgment. The claimant thereafter entered a postjudgment settlement and release of all claims, known or unknown, which arose "from the accident," specifically waiving section 1542. The designated releasees were the driver, the owner *and their insurer.* (170 Cal.App.3d at p. 924.)

The claimant subsequently sued the insurer for unfair practices under Insurance Code section 790.03, claiming bad faith refusal to settle. The insurer moved for summary judgment based on the release, which the claimant opposed on the ground the release was intended to apply only to injuries suffered from the accident itself, not to postaccident bad faith conduct by the insurer. (*Vega v. Western Employers Ins. Co., supra*, 170 Cal.App.3d at pp. 924-925.) The *Vega* court addressed the issue of whether ". . . as a matter of law . . . the general release of an insurance carrier from 'any and all claims' executed following a postjudgment settlement of a personal injury action extends to [bad faith] actions brought against the insurer . . . ." (*Id.* at p. 924.)

The *Vega* court concluded it could not declare that the release barred claims for postaccident bad faith conduct *as a matter of law*, holding instead that a factual issue existed as to whether the parties intended the release to

the release." (*Id.* at p. 110.) From these premises, Winet claims we must look to evidence other than the language of the release, further arguing that such evidence, being in conflict, raised issues of fact precluding summary judgment. We note, however, that *Casey* predated both *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra*, 69 Cal.2d 33 and *Parsons v. Bristol Development Co., supra*, 62 Cal.2d 861. To the extent *Casey* holds we must ignore the language of the release and examine only extrinsic evidence in evaluating the parties' intent, *Casey* would be inconsistent with the *Pacific Gas & E. Co.* admonition that the contractual language is the source of the parties' rights and duties, and that extrinsic evidence is examined only to construe any ambiguities extant in the language. (*Pacific Gas & E. Co., supra*, at pp. 38-40.) To the extent *Casey* holds the issue of intent is invariably vested in the jury, it would be inconsistent with *Parson's* holding that construction of an instrument is a question of law for the court when, as here, the competent parol evidence is undisputed. (*Parsons v. Bristol Development Co., supra*, 62 Cal.2d at p. 865.)

extend to such conduct. (*Vega v. Western Employers Ins. Co., supra*, 170 Cal.App.3d at pp. 926-927.) However, the *Vega* court's analysis was predicated on its conclusion that the scope of the release was ambiguous. It questioned whether the inclusion of the insurer's name in a release otherwise directed toward releasing the tortfeasors for their conduct was intended merely to release the insurer for liability arising *from the tortfeasors' conduct*, or intended *also* to release the insurer from its *own* tortious conduct. (*Id.* at pp. 926-927.) The court concluded parol evidence was required to clarify this ambiguity and determine the parties' intent. (*Ibid.*)

The *Vega* decision is distinguishable and provides no support for Winet's argument, principally because the central predicate of *Vega* (existence of an ambiguity as to the release's scope) is lacking here.[8] The *Vega* court perceived an ambiguity as to the release's intended scope: Was the insurer released only in its role as indemnitor for the tortfeasors, or was it released for its own misconduct as well? No similar ambiguity is present here. The entire agreement was designed and tailored to release the specifically named actors from liability for claims arising from their own conduct occurring during their relationship.

## V.  *Conclusion*

" '[The] law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. It judges of his intention by his outward expressions and excludes all questions in regard to his unexpressed intention. If his words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on that subject.' " (*Crow v. P.E.G. Construction Co., Inc.* (1957) 156 Cal.App.2d 271, 278-279 [319 P.2d 47].) General releases which purport to extinguish unknown and nonmatured claims can no doubt be subject to abusive use. Particularly when the parties are in unequal bargaining positions or other factors make the release doubtful as to whether its terms were actually understood, or its enforcement otherwise inequitable for some reason, judges will seek grounds to avoid literal enforcement. This leads those in the practice of law to conclude, at times, that it is virtually

---

[8] *Vega* is also distinguishable because it involved policy concerns applicable to insurance bad faith claims. The *Vega* court extensively discussed the many cases analyzing whether a release of personal injury claims should be extended to encompass the separable bad faith conduct of insurers, noting the potential policy concerns if an insurer could use unfair practices to compel a settlement of the underlying claim and thereafter use that settlement to shield itself from liability for such unfair practices. (*Vega v. Western Employers Ins. Co., supra*, 170 Cal.App.3d at pp. 925-926.) This case involves no similar concerns of overreaching or quasi-fiduciary relations.

impossible to create a general release that will actually achieve its literal purpose, which is to extinguish all future claims regardless of their then status in terms of either maturity or knowledge. That thought should be rejected. Those engaged in contract law and litigation are in great need of the availability of ironclad and enforceable general releases. We deal in this case with a release that is about as complete, explicit and unambiguous as a general release can be. Our decision to uphold the release and enforce it in accord with its literal terms is in harmony, we believe, with a beneficial principle of contract law: that general releases *can* be so constructed as to be completely enforceable.

DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and Huffman, J., concurred.