Filed 12/9/13  Cathedral Group v. Gen. Construction Management Co. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CATHEDRAL GROUP, LTD., | |
|     Plaintiff, Cross-defendant, and Appellant, | E054971 |
| v. | (Super.Ct.No. INC079181) |
| GENERAL CONSTRUCTION MANAGEMENT COMPANY, | O P I N I O N |
|     Defendant, Cross-complainant, and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Randall Donald White, Judge.  Affirmed.

Hill, Farrer & Burrill, Dean E. Dennis, and Neil D. Martin for Plaintiff, Cross-defendant, and Appellant.

Roemer & Harnik, Brian S. Harnik, and Helene P. Dreyer Koch for Defendant, Cross-complainant, and Respondent.

## I.  INTRODUCTION

Respondent General Construction Management Company (General), a general contractor, completed a 40-unit condominium project for appellant Cathedral Group, Ltd. (Cathedral), a real estate developer, after another contractor left the job.  The parties signed a "Cost of the Work Plus a Fee" contract on American Institute of Architects (AIA) Document A114 (the AIA contract).  The AIA contract did not expressly authorize General to be paid for "general conditions" expenses, but section 7.7.1 authorized payment for "[o]ther costs incurred . . . to the extent, approved in advance in writing" by Cathedral.

A dispute arose concerning whether the parties agreed, before they signed the AIA contract, that General would be paid the fixed sum of $42,640 per month for its estimated general conditions expenses, including its project-related staff time and off-site office overhead.  Cathedral claimed there was no such parol agreement:  the AIA contract governed the issue; the AIA contract did not authorize payment for any estimated general conditions expenses; and no off-site office overhead or off-site staff time was either identified in or compensable under the AIA contract.

General claimed the parties' principals, Gary Covel for General and Moe Nasr for Cathedral, agreed General would be paid $42,640 per month, its estimated general conditions expenses, before the AIA contract was signed, and that Nasr confirmed the agreement both in writing and by his conduct.  Thus, General argued, section 7.7.1 of the

2

AIA contract, the "other costs" provision, required Cathedral to pay General the agreed upon, fixed monthly sum for estimated general conditions expenses.

Following a bench trial, the trial court found in favor of General and awarded it $401,035.85, plus interest, for Cathedral's breach of the AIA contract. Among other things, the court credited Covel's testimony that he and Nasr agreed General would be paid $42,640 per month for general conditions expenses, with no requirement for "backup" documentation, and found Nasr's testimony denying the agreement not credible.

Cathedral asserts three claims of error on this appeal: (1) the trial court misinterpreted the AIA contract and violated the parol evidence rule in construing section 7.7.1 as authorizing payment for General's estimated general conditions; (2) the AIA contract is inconsistent with and therefore precludes the court's additional finding that Cathedral was barred from denying the prior oral agreement based on waiver and estoppel principles; and (3) General failed to prove its damages with competent evidence.

We interpret the AIA contract de novo and conclude, with the aid of extrinsic evidence, including the principal's testimony, that section 7.1.1 is reasonably susceptible to the interpretation urged by General: it authorizes payment for General's estimated general conditions expenses. We also conclude substantial evidence supports the trial court's conclusion that the parties did in fact intend and agree that section 7.7.1 required Cathedral to pay General $42,640 per month for general conditions expenses. We reject Cathedral's other claims of error and affirm the judgment in all respects.

3

## II. FACTS AND PROCEDURAL HISTORY

### A. *Background*

In 2005 and 2006, Cathedral owned a 40-unit condominium project under construction in Cathedral City (the project). Cathedral's principal, Moe Nasr, was the architect on the project and had over 25 years of experience in real estate development. The first contractor to work on the project, Gencon Construction (Gencon), agreed to complete the project for the fixed fee of $4,435,040. Gencon's fixed fee included an 8 percent contractor's fee and a 5 percent fee for "general conditions."

By late 2006, there were problems with Gencon's work and Cathedral hired a new general contractor, General, to complete the project. General's principal, Gary Covel, had over 30 years of experience as a general contractor and was familiar with AIA contract documents. Due to the "enormous unknowns" involved in assuming the project and correcting problems in Gencon's work, Covel would not agree to complete the project for a fixed sum. Instead, Covel and Nasr agreed that General would complete the project for the costs of construction plus an 8 percent contractor's fee.

In a "cost plus" contract arrangement, the owner has no guaranteed maximum price protection; the owner simply agrees to pay the costs of construction plus a contractor's fee. The central dispute in this case is whether Cathedral agreed to pay General a fixed monthly fee of $42,640 for *estimated* but undocumented general conditions expenses *in addition to* the other costs of constructing the project plus an 8 percent contractor's fee.

4

B. *The Pre-AIA Contract Discussions*

In September 2006, Nasr and Covel met to discuss the project before they signed the AIA contract in December 2006. According to Nasr, he and Covel discussed and agreed that General's compensation would be the cost of construction, including the costs of "general conditions" incurred *on the project site* (e.g., temporary utilities, water trucks, cleaning, protection, security), plus an 8 percent contractor's fee.

Nasr claimed the compensable "general conditions" costs included "any labor that the contractor uses on the job," but not the costs of General's supervisory and other personnel who worked on the project, or General's off-site office overhead expenses. In Nasr's view, the 8 percent contractor's fee was to cover General's off-site overhead and personnel expenses. Nasr denied he ever agreed to pay General a flat monthly fee or a stipulated sum for general conditions expenses.

Covel's testimony was at odds with Nasr's regarding General's compensation for general conditions expenses and what those expenses included. According to Covel, in September 2006, he and Nasr discussed and agreed that General would receive a fixed fee of $42,640 "and some odd dollars" per month for general conditions. Covel testified: "We agreed on a fixed fee. The general conditions are an estimate of the cost to the contractor to do the work, and it's typically a fixed fee that's arrived at through negotiations . . . and that's exactly how we did this one."

General's permanent office in Rancho Mirage was only 5 to 10 minutes from the project site. Thus, according to Covel, he and Nasr agreed they would use the telephones, faxes, personnel, and equipment at General's off-site office rather than incur the costs associated with an on-site construction trailer, including storage, telephones, faxes, and equipment. General's off-site office expenses and personnel costs were to be part of the general conditions estimate, along with General's personnel costs associated with the project. Covel would not have agreed to complete the project had he understood he would not receive a fixed monthly fee for these general conditions expenses.

All of the testimony and documentary evidence concerning the parties' pre-AIA contract discussions and communications was provisionally admitted into evidence over Cathedral's objection based on the parol evidence rule.

C. *The AIA Contract Terms*

In December 2006, the parties signed the AIA contract, titled "Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Cost of the Work Plus a Fee without a Guaranteed Maximum Price." Article 7 of the AIA contract is titled "Costs to Be Reimbursed." Section 7.1 states: "The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 7."

In preprinted type, section 7.2.2 authorizes payment for "[w]ages or salaries of the Contractor's supervisory and administrative personnel *when stationed at the site* with the Owner's approval" (italics added), but this sentence is marked "N/A." In the next paragraph, section 7.2.2 continues in preprinted italics: "*If it is intended that the wages or salaries of certain personnel stationed at the Contractor's principal or other offices shall be included in the Cost of the Work, identify the personnel to be included, whether for all or only part of the time and the rates at which time will be charged to the Work.*" No persons or rates are listed under the italicized provision.

Article 7 goes on to list additional costs the owner must pay. Other than section 7.2.2, no provision in article 7 expressly authorizes payment for any personnel costs or *off-site* office costs.[1] But section 7.7.1 authorizes payment for "[o]ther costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner."

Article 8 is titled "Costs Not to be Reimbursed" and states in section 8.1: "The Cost of the Work *shall not include*: .1 Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Sections 7.2.2 and 7.2.3, or as may be

---

[1] Section 7.2.3 authorizes payment for "[w]ages and salaries of the Contractor's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work." Section 7.5.4 authorizes payment for document reproductions, facsimiles, telephone calls, and similar expenses incurred "at the site" or "the site office."

provided in Article 14.[2] [¶] .2 Expenses of the Contractor's principal office and offices other than the site office. [¶] .3 Overhead and general expense except as may be expressly included in Article 7. [¶] . . . [¶] .7 Any cost not specifically and expressly described in Article 7."

Section 1.1 contains an "integration" clause: "The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. . . ." Section 1.1.1 limits what can constitute a modification of the contract to written amendments signed by both parties, change orders, and written change directives.

Section 13.4.2 contains a no waiver by conduct provision: "No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing." Finally, articles 11 and 12 authorize Cathedral to audit General's books and records and make adjustments prior to "final payment."

David Brotman, an architect, testified for Cathedral concerning the application of the AIA contract provisions. According to Brotman, the "N/A" after the first sentence of section 7.2.2 meant that General was not to be paid for the costs of its project-related supervisory and administrative personnel, and any work performed in General's off-site

---

[2] Article 14, titled "Miscellaneous Provisions," does not address the "Cost of the Work" or any off-site costs.

office was its own overhead expense and was not to be reimbursed under the AIA contract.

Brotman also testified that section 7.7.1 was an "open door" provision intended to cover costs the parties did not know about, provided they were approved in writing. Section 7.7.1 only covered costs that were not otherwise covered in the AIA contract, however. In Brotman's opinion, any "estimated amounts" for general conditions was not a compensable "Cost of the Work," as the term was defined in articles 7 and 8 of the AIA contract. Article 11 gave Cathedral the right to audit the job, and General should have had receipts for all of its expenses and time cards for workers who worked on the job site.

The parties originally believed the project could be completed in 90 days. The AIA contract required General to achieve "[s]ubstantial [c]ompletion" by April 15, 2007, but the project was not completed until June 5, 2008. Numerous problems with Gencon's work had to be remediated.

D. *The "General Conditions Estimate"*

Shortly after the AIA contract was signed, Cathedral made an initial "prepayment" to General of $75,000 on December 15. On January 4, 2007, General sent its first invoice to Cathedral listing "General Conditions[,] December 13-January 5[,] Amount $1,627.50 per day [¶] Total $39,060.00 [¶] Balance Due $39,060.00." Attached to General's first invoice was a one-page breakdown titled "General Conditions Estimate," listing General's "General Expense[s]" and "Project Staff" expenses on monthly and six-month bases.

9

The General Conditions Estimate identified the job functions of each staff person working for General on the project, and an estimate of the portion of their time they would be working on the project (e.g., "Project Executive (15% of time)," "Project Engineer (50% of time)," "Project Superintendent (100% of time))." The estimate also listed the "Unit Cost" of each project staff member on per month and six-month bases. "Total Project Staff" expenses were estimated to be $42,640 per month and $233,340 for six months. Total "General Expense[s]" were estimated to be $6,185.01 for the first month of the project and $14,235 for six months, bringing the total general conditions estimate to $247,575.

In preparing the General Conditions Estimate, Covel used a form titled "General Conditions Estimate" given to him by Nasr in September 2006 which Nasr and Gencon used in preparing Gencon's contract. Covel filled in his estimated amounts next to the line items listed, and testified the line items listed were "typically items that are paid or associated with a construction trailer, an office," and the "project staff" expenses were for "folks that it takes to man the job[,] . . . provide the supervision and the work force . . . ."

Nasr testified he sent the blank General Conditions Estimate to Covel "to explain to him what his fee of 8 percent would cover." Nasr did not consider the line items listed on the estimate to be included in the costs of the work, but he never told Covel or General that either orally or in writing.

General billed Cathedral a total of $2,881,597.98 for the project, including $444,140 for general conditions. The $444,140 amount for general conditions was billed in monthly increments: $39,060 in January 2007; $42,640 in February through August 2007; $21,320 in September 2007; and $42,640 in April and May 2008. Cathedral paid General's January 4, 2007, invoices and several subsequent invoices, without objection.

Nasr explained he paid many of General's invoices even though they included estimated general conditions expenses because he knew Cathedral had the right to audit General's project-related expenses at the end of the job and he would be entitled to recoup any overpayment. He considered his interim payment of General's invoices to be "a rolling draw" by General, pending the audit at the end of the job. When asked why he was not worried his payment of the invoices might mislead Covel to believe General's estimated general conditions expenses were proper charges, Nasr replied: "Because we had a contract."

E. *The Early 2007 E-mail Exchanges*

Cathedral indicated in a series of early 2007 e-mails that it agreed before General began working on the project to pay General for "general conditions." In the e-mails, Cathedral sought breakdowns and back up documentation of the amounts General was billing for "Estimated General Conditions." The e-mails indicated Cathedral's lender was requesting the itemizations and documentation as a condition of releasing funds to pay the general conditions portions of General's invoices. The e-mails are detailed here.

11

On February 9, 2007, Nicole Voraberger, who handled bookkeeping for Cathedral, e-mailed General concerning its January invoice, asking it to specify "what the Gen. Condition were for [*sic*]?"  On February 2, Gina Wilkerson, Voraberger's counterpart at General, replied: "Here is the breakdown for January.  You should have received the hard copy with all the invoices . . . .  [¶]  I have also attached a copy of the estimated general condition provided by your company and [that] was approved prior to the start of the project.  Our General [C]onditions was an estimate of the approximate time required to complete this project.  As of this point the hours have exceeded the estimated cost.  Hopefully this information will suffice for the bank."

On March 16, Voraberger sent General another e-mail asking for "a breakdown" of the general conditions of $42,640 on the "last draw," apparently referring to General's March 2007 invoice.  On March 19, Wilkerson responded: "I am glad you brought this to my attention.  This is the form that was sent to Moe [Nasr] before we started the project.  It was approved prior to us starting.  I have inadvertently been billing you [$]42,640.00 that is for the project staff only.  The general expense amount comes up to $1,610.01 a month.  The actual monthly amount is $48,825.01.  I hope there is some way to add the [$]3,220.02 that has been shorted the last two months. . . ."

On March 20, Voraberger responded: "I need a little bi[t] more info.  *We do know that the Gen. Cond. total amount was approved by Moe [Nasr]*.  Could you tell me your people breakdown on the Gen. Cond.  I guess this is helpful in case of bank audit.  Do you guys keep time sheets in case of audit stating how many hours the different people

spend on our project[?] Please help me with any of these question[s] to process the draw." (Italics added.)

Following additional e-mails, Wilkerson wrote to Voraberger on April 4 saying she had received a check but "[w]e noticed that it was $42,640.00 short and [we] were wondering when to expect that." Voraberger replied: "As you know no back up was provided for the general condition draw amount on all three draws. This is the reason the bank held back the funding."

On April 5, Nasr wrote to Wilkerson about the lack of detailed breakdown for the general conditions billings: "Gina: Normally, our contract has a fee of 8% and General condition of 8%. The contractor charges as % of completion each month so if they do $250[,]000 worth of work they get $20[,]000 in general condition and 250[,]000+20[,]000=270[,]000x.08=$21[,]600 in fee. *No one will ask for GC back up* [in those circumstances]. However since this is time and material contract and per your bills it looks like all expenses included in the body of the project, such as cleaning or power and other standard GC items. And the general condition amount is so large in comparison to the contract amount, it needs to be explained: *We did ask for this cost before we started the project as I told Gary [Covel] I will pay it*. But as we go forward each month I need to explain each position's time on that list. I can not just tell the bank that you have no other contract and you Gary Sr. and Gary Jr. work on this full time plus an engineer and a field super. In future phases we will go back to standard contract so we won[']t have this problem."

Covel testified that in his 30 years in the construction business he had never been asked to provide "backup" documentation for general conditions. When Cathedral asked for documentation for the general conditions estimates, General provided the general conditions estimates and some "daily logs."

F. *The Amounts Claimed by Each Party*

In October 2007, General stopped work on the project. Cathedral was behind in paying General's monthly invoices. The parties agreed to a payment plan that allowed the project to continue but that did not resolve their dispute over the general conditions expenses. General again stopped work in February 2008, but completed the project on June 5, 2008. Upon completion of the project on June 5, 2008, General claimed Cathedral owed it $401,035.85 on the project.

On May 28, 2008, near the end of the project, Cathedral's counsel requested an audit of General's project costs under the final adjustment and resolution provisions of the AIA contract set forth in article 11. In July 2008, Cathedral's attorney hired John Maxwell, a certified public accountant, to review the invoices General claimed it paid in completing the project. On August 1, Maxwell completed his analysis and concluded General's "cost of the work" totaled $2,120,889.65. This amount, plus the 8 percent contractor's fee, totaled $2,290,560.70 and represents the total amount Cathedral claimed it owed General under the AIA contract. Cathedral paid General $2,447,962.17. Thus, Cathedral claimed it overpaid General $157,401.40 ($2,447,962.17 minus $2,290,560.70) and was entitled to recover the overpayment.

14

In June 2008, General recorded a mechanic's lien on the project, and Cathedral sued to remove the lien. General cross-complained for breach of contract, foreclosure of mechanic's lien, quantum meruit, and open book account. The mechanic's lien was removed and Cathedral amended its complaint to seek the alleged overpayment.

G. *Decision and Judgment*

Following the bench trial in May 2011, the court issued a statement of decision in favor of General and against Cathedral on their respective claims. The court ruled that section 7.7.1 of the AIA contract required Cathedral to pay General $42,640 per month for general conditions expenses. Alternatively, the court ruled Cathedral was barred from denying it agreed to pay the estimated general conditions expenses based on principles of waiver and equitable estoppel. Judgment was entered in favor of General for $401,035.85, plus 10 percent interest from June 5, 2008. Cathedral appealed.

## III. DISCUSSION

A. *Section 7.7.1 and the Parol Evidence Rule*

Cathedral initially claims the court violated the parol evidence rule in interpreting section 7.7.1, the "other costs" provision of the AIA contract, as requiring Cathedral to pay General's estimated general conditions expenses. We begin by reviewing the settled principles of contract interpretation governing this claim.

1. Principles of Contract Interpretation

The goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. (Civ. Code, § 1636; *Cedars-Sinai Medical Center v. Shewry*

15

(2006) 137 Cal.App.4th 964, 979.) When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible. (Civ. Code, § 1639.)

Under California's parol evidence rule, "'[w]hen the parties to a written contract have agreed to it as an "integration"—a complete and final embodiment of the terms of an agreement—parol [i.e., extrinsic] evidence cannot be used *to add to or vary* its terms.'" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 953, italics added, quoting *Masterson v. Sine* (1968) 68 Cal.2d. 222, 225; Code Civ. Proc., § 1856, subds. (a), (b); Civ. Code, § 1625.) An agreement may be completely or only partially integrated; that is, the parties may intend a writing to be a final and complete expression of their entire agreement or of only certain terms of their agreement. (*Masterson v. Sine, supra,* 68 Cal.2d. at p. 225.) If an agreement is only partially integrated, then the parol evidence rule applies only to the integrated part. (*Ibid.*) Still, the terms of an integrated agreement may be *explained* by evidence of the parties' course of dealing and course of performance. (Code Civ. Proc., § 1856, subd. (c).) The court may also consider the circumstances under which the contract was made and the situation of the parties in construing the terms of an integrated agreement. (Code Civ. Proc., §§ 1856, subd. (g), 1860.)

The parol evidence rule also does not prohibit the provisional introduction of extrinsic evidence to explain meaning of a written contract if its terms are reasonably susceptible to the meaning urged. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [parol evidence admissible to

16

construe ambiguous language of written instrument].) "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37; *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 754.)

The decision whether to admit parol evidence actually involves a *two-step* process: "First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. [Citation.] . . . [¶] Different standards of appellate review may be applicable to each of these two steps, depending upon the context in which an issue arises. The trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus the threshold determination of ambiguity is subject to independent review. [Citation.] . . .

"The second step—the ultimate construction placed upon the ambiguous language—may call for differing standards of review, depending upon the parol evidence used to construe the contract. When [as here] the competent parol evidence is in conflict,

17

and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence.  [Citation.]"  (*Winet v. Price, supra,* 4 Cal.App.4th at pp. 1165-1166; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., supra,* 109 Cal.App.4th at p. 953.)

  2. <u>Section 7.7.1 is Reasonably Susceptible to the Interpretation Urged by General</u>

  The parties agree the AIA contract is integrated on the question of General's compensation for project-related expenses, including general conditions expenses.  Their dispute centers on whether section 7.7.1 of the AIA contract is reasonably susceptible to the interpretation urged by General, namely, that it authorizes payment for General's $42,640 in estimated monthly general conditions expenses.

  We review this question de novo.  (*Winet v. Price, supra,* 4 Cal.App.4th at p. 1165.)  Based on the terms of the AIA contract and the testimony of Covel and Nasr concerning the parties' precontract discussions and intentions in entering into the contract (see *ibid.*), we agree with the trial court that section 7.7.1 is reasonably susceptible to being interpreted to require payment for General's estimated general conditions expenses.

  Section 7.7.1 authorized payment for "*[o]ther costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner*."  (Italics added.)  Architect Brotman testified that section 7.1.1 is an "open door" provision that allows payment of costs *not otherwise* identified in the contract.  "General conditions" expenses, as the parties defined them in the general conditions estimate, were costs not otherwise identified in the AIA contract.

Our interpretation of section 7.1.1 is consistent with the other terms of the AIA contract, including section 7.2.2. The parties marked "N/A" after the first sentence of section 7.2.2, which would have authorized General to be paid for "wages or salaries of [its] supervisory and administrative personnel *when stationed at the site . . . .*" (Italics added.) But there was no construction trailer on the site. As a result, none of General's project-related staff were "stationed" at the project site. General's office was only 5 to 10 minutes away from the project site, and Covel and Nasr agreed that using General's nearby office would save the costs associated with a construction trailer. This explains why the first sentence of section 7.2.2 was marked "N/A." It also meant General would not recoup the costs of "Temporary Facilities and Related Items" authorized by section 7.5, or on-site office expenses, authorized by section 7.5.4.

The second sentence of section 7.2.2 authorized payment for off-site stationed personnel, provided they were listed, but no off-site stationed personnel are listed after the second sentence of section 7.2.2. But the parties' antecedent agreement to pay General a fixed monthly sum for general conditions expenses, including for off-site stationed personnel, explains why no off-site personnel were listed after the second sentence of section 7.2.2. Rather than list off-site personnel in section 7.2.2, General's "general conditions estimate" included the same information together with estimates of General's off-site overhead expenses, the other major component of the General's estimated general conditions expenses.

Cathedral argues section 7.7.1 is not reasonably susceptible of being interpreted to authorize payment for the general conditions in view of sections 8.1 and 7.2.2. Section 8.1 excludes three items from the compensable "[c]ost of the [w]ork": (1) "[o]verhead and general expenses"; (2) off-site office expenses; and (3) expenses for personnel "stationed at the Contractor's principal office . . . except as specifically provided in Sections 7.2.2 . . . ." Because no off-site personnel are listed in section 7.2.2 and section 7.7.1 only authorizes payment for "other costs" *not otherwise* identified in the contract, Cathedral argues section 7.7.1 cannot reasonably be interpreted as authorizing payment for General's general conditions expenses. We disagree.

No "general conditions expenses," as the parties defined them in the agreed-upon General Conditions Estimate, are identified in the AIA contract. In the general conditions estimate, which Nasr approved both in writing and by his conduct, the parties defined "general conditions expenses" as including off-site office overhead expenses and off-site personnel expenses. If a construction trailer had been placed on the project site, the costs of "temporary facilities" (i.e., a construction trailer) and "expenses of the site office" would have been compensable under sections 7.5 and 7.5.4. But it was discussed and agreed that no such expenses would be incurred because General's off-site office would be used in lieu of a construction trailer. The absence of a construction trailer also explains why no *off-site stationed* personnel were listed in section 7.2.2, but were instead listed in the general conditions estimate. In sum, the estimated general conditions expenses, as the parties defined them, included covered costs that would have otherwise

20

been paid under sections 7.2.2, 7.5, and 7.5.4 had there been an on-site construction trailer.

Under these circumstances, section 7.7.1 is reasonable susceptible to General's interpretation. Given the absence of a construction trailer and Covel's testimony that contractors are typically paid their general conditions expenses as part of the costs of a project, Cathedral's interpretation of the AIA contract as prohibiting compensation for the estimated general conditions expenses is unreasonable. (Code Civ. Proc., § 1856, subd. (g); Civ. Code § 3542 [interpretation of contract must be reasonable].)

Cathedral's interpretation would require General to assume all of the costs of its project-related personnel and project-related office expenses. According to Covel, that is inconsistent with logic and construction industry standards. In light of the foregoing, we reject Cathedral's additional claim that payment for the estimated general conditions constituted an unauthorized (i.e., unwritten and unapproved) modification of the AIA contract.

3. Substantial Evidence Supports the Trial Court's Conclusion That Section 7.7.1 Required Cathedral to Pay General's Estimated General Conditions Expenses

The second part of our analysis is governed by the substantial evidence standard of review. (*Winet v. Price, supra,* 4 Cal.App.4th at pp. 1165-1166.) The parties presented conflicting evidence on the question, but substantial evidence supports the trial court's ultimate construction of section 7.1.1 as requiring Cathedral to pay General's estimated general conditions expenses: Covel testified he and Nasr agreed General would be paid

21

around $42,640 per month for general conditions expenses, before the AIA contract was signed. Nasr gave Covel a blank "General Conditions Estimate" form to complete, and Covel did so. Nasr then approved General's estimated general conditions expenses *in writing*. (AIA contract, § 7.1.1.)

Nasr approved the estimated general conditions expenses in writing in his April 5, 2007, e-mail to General's bookkeeper. In the e-mail he said he needed a breakdown of the fixed amounts General was billing for general conditions to satisfy Cathedral's lender, but not because he was disputing Cathedral's obligation to pay the estimated amounts invoiced. In reference to the estimates, he wrote: "*We did ask for this cost before we started the project as I told Gary [Covel] I will pay it*." (Italics added.)

In the same April 2007 e-mail, Nasr explained that in a fixed-fee contract, which typically includes a fixed amount for general conditions, "*[n]o one will ask for GC back up*," but in this case Cathedral's bank was asking for backup because the parties had an open-ended, cost-plus-fee contract. In a May 2007 e-mail to Covel, Nasr again confirmed Cathedral was obligated to pay the estimated general conditions expenses: "Gary: Now that I['ve] got this out of them[,] I am going to fight for the balance," meaning all of General's estimated monthly general conditions expenses. Nasr also admitted that Cathedral's payments to General were not conditioned on bank approval. Finally, Nasr paid many of General's invoices, without objection, and each invoice included a full or partial month's charges for estimated general conditions expenses.

Nasr never told General he was paying the general conditions expenses under protest or pending an audit at the end of the job.

B. *Waiver and Estoppel Were Properly Applied*

Based on Nasr's conduct and representations to General, the trial court concluded Cathedral was estopped from claiming, and waived any right it may have had to claim, it was not obligated to pay the estimated general conditions expenses. Cathedral challenges the sufficiency of the evidence supporting these findings, and also challenges the court's authority to make them in light of the nonwaiver provisions in the AIA contract at section 13.4.4. These claims are without merit.

As the trial court pointed out in its statement of decision: "It is well settled that the rule against varying the terms of a written instrument by parol [evidence,] or seeking to alter a contract in writing other than by a contract in writing or an executed oral agreement, is subject to the exception that a party to a contract may by conduct or representations waive the performance of a condition thereof or be held estopped by such conduct or representations to deny that he has waived such performance." (*Panno v. Russo* (1947) 82 Cal.App.2d 408, 412.)

Waiver is the intentional relinquishment of a known right and may be implied by a party's conduct manifesting its intention to waive a known right. (*Gould v. Corinthian Colleges, Inc.* (2011) 192 Cal.App.4th 1176, 1179.) A party may waive a contractual right when its conduct is "so inconsistent with any intent to enforce the right as to induce a reasonable belief that it has been relinquished." (*Utility Audit Co., Inc. v. City of Los*

23

*Angeles* (2003) 112 Cal.App.4th 950, 959.)  Similar to waiver, equitable estoppel arises when a party has, by statements or conduct, reasonably led another to believe a particular thing true and to act upon such belief to his detriment.  (*Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 186-187.)

"Waiver is a question of fact for the trial court."  (*Gould v. Corinthian Colleges, Inc., supra,* 192 Cal.App.4th at p. 1179.)  Likewise, the "reasonable reliance" element of equitable estoppel is a question of fact for the trial court.  (*Superior Dispatch, Inc. v. Insurance Corp. of New York, supra,* 181 Cal.App.4th at p. 187.)  We review the court's waiver and estoppel findings for substantial evidence (*Panno v. Russo, supra,* 82 Cal.App.2d at p. 413) and conclude substantial evidence supports the court's applications of the waiver and estoppel doctrines to Cathedral's conduct.

In its statement of decision, the trial court found Covel's testimony credible and Nasr "incredible in his denial" that the parties agreed General would be paid for its estimated general conditions expenses.  In addition, Nasr's conduct showed a clear intention to waive any right Cathedral may have had not to pay the estimated general conditions expenses.  Nasr's conduct also reasonably induced General to rely on Cathedral's continuing representation that it would pay the expenses.

Cathedral paid General's first invoice dated January 4, 2007, for *estimated* general conditions expenses *only*, without objection, and paid several more invoices without objection.  In the April and May 2007 e-mails to General, Nasr confirmed in writing Cathedral's agreement to pay estimated general conditions expenses, despite the demands

24

by Cathedral's lender for documentation supporting the estimates. Nasr conceded he never told Covel or anyone else at General he believed Cathedral had no obligation to pay the estimates, and Covel testified he never would have accepted the project had he known Cathedral had no intention of paying his monthly, estimated general conditions expenses.

Cathedral argues the trial court's waiver and estoppel rulings are in error because section 13.4.2 of the AIA contract expressly precluded waiver by conduct: "No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract . . . ." Not so.

As General points out, numerous jurisdictions have held anti-waiver provisions to be of little effect because the anti-waiver provision can itself be waived, and prohibiting waiver in some circumstances would be "manifestly unjust." (See 1 Bruner & O'Connor on Construction Law (2012) § 4.40; 2 Bruner & O'Connor on Construction Law, *supra*, § 5.249.) California case law is in accord. (*Gould v. Corinthian Colleges, Inc., supra,* 192 Cal.App.4th at p. 1180 [noting absence of authority that anti-waiver lease provision could not be waived and that to find the provision had not been waived would have been "absurd, not to mention unconscionable" under the circumstances]; *Panno v. Russo, supra,* 82 Cal.App.2d at pp. 411-413; *Bettelheim v. Hagstrom Food Stores* (1952) 113 Cal.App.2d 873, 878.)

25

Cathedral maintains there was no clear showing of waiver (*Utility Audit Co., Inc. v. City of Los Angeles, supra,* 112 Cal.App.4th at p. 959 [waiver of legal right cannot be established without clear showing of intent to give up the right].)  It argues Nasr did not clearly waive Cathedral's right not to pay the estimated general conditions expenses. Rather, the evidence showed he paid the expenses only because he knew he could audit the job, and he had every intention of asserting that none of the expenses were payable at the end of the job.  We are not unpersuaded.  The evidence supporting both waiver and estoppel was sufficiently clear:  through Nasr's conduct in paying General's invoices without objection, and his failure to tell General he was paying the invoices under protest pending an audit at the end of the job, Cathedral waived and was equitably estopped from asserting any right it may have had to claim it was not obligated to pay General's estimated general conditions expenses.

C.  *There Was No Failure of Proof on General's Damages*

Cathedral claims General's damages claim of $401,035.85 suffers from a failure of proof because General's invoices were not admitted for the truth of their contents but only for the limited purpose of showing they were received and processed by Nasr.  Thus, Cathedral argues, "[i]t was General's burden to prove that the costs on its invoices were true costs incurred on the job," and General did not meet that burden.  We disagree there was any failure of proof.

26

At trial it was undisputed and competent evidence was presented showing that General's invoices to Cathedral totaled $2,881,597.98; Cathedral paid General a total of $2,447.962.17; and Cathedral was entitled to around $32,600 in credits. Thus, by simple calculation, the amount unpaid on General's invoices to Cathedral was $401,035.85.[3]

In addition, Cathedral presented evidence that General incurred $2,120,889.65 in project-related costs, exclusive of estimated general conditions expenses, and that Cathedral owed General the $2,120,889.65 sum plus an 8 percent contractor's fee, or $2,290,560.70. Cathedral thus claimed it overpaid General $157,401.47 ($2,447,962.17 minus $2,290,560.70) and was entitled to the overpayment.

But the $401,035.85 amount unpaid on General's invoices to Cathedral, and awarded to General, was around $43,000 less than the $444,140 amount the invoices included for estimated general conditions expenses. Nasr agreed to pay General $42,640 per month in *estimated* general conditions expenses *in lieu of* off-site personnel and office overhead costs *actually incurred* by General. And General's invoices included the agreed-upon $42,640 monthly amount for estimated general conditions expenses, though the amount was prorated for partial months General worked on the project.

All of this evidence is sufficient to support General's claim of $401,035.85 in damages as a result of Cathedral's breach of the AIA contract. Because Nasr agreed to pay General's estimated rather than its actual costs incurred for general conditions expenses, it was unnecessary for General to show its invoices represented "true costs

---

[3] We disregard the rounding error.

27

incurred on the job," as opposed to agreed upon, estimated costs incurred on the job, to the extent the invoices included the estimated general conditions expenses.

## IV.  DISPOSITION

The judgment is affirmed.  General shall recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

J.

We concur:

RAMIREZ _____

P. J.

CODRINGTON _____

J.