Filed 2/26/14  Spine Care & Orthopedic Physicians v. Kingston CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| SPINE CARE & ORTHOPEDIC PHYSICIANS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>PAUL A. KINGSTON et al.,<br><br>    Defendants and Respondents. | B242557<br><br>(Los Angeles County<br>Super. Ct. No. GC037692) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory W. Alarcon, Judge.  Affirmed.

Charles E. Clark for Plaintiff and Appellant.

Law Office of Paul A. Kingston and Kristi Ann Holtdorf for Defendants and Respondents.

After suffering personal injury in an accident, Karen Wright (not a party to this action) filed a personal injury action in which she was represented by an attorney, Paul Kingston. Physician Michael Schiffman and Spine Care & Orthopedic Physicians (SCOP) treated Wright for her injuries. In connection with that treatment, Wright and Kingston signed a document that, among other things, gave SCOP a lien over the proceeds of Wright's litigation.

Wright did not recover at trial and did not pay her medical bills. SCOP then billed Kingston for Wright's medical expenses, which Kingston refused to pay. SCOP filed a lawsuit against Kingston, contending he personally had guaranteed payment of Wright's medical bills. Following a two-day bench trial, the court entered judgment for Kingston, concluding that he had agreed only to honor SCOP's lien, not personally to guarantee payment of Wright's medical bills.

SCOP appeals, contending that the trial court interpreted the medical lien inconsistently with its plain language, improperly relied on extrinsic evidence, and relied on extrajudicial sources. We disagree with each of SCOP's contentions, and thus we affirm.

## STATEMENT OF FACTS AND OF THE CASE

### I. The Medical Lien

After being injured in an accident in March 2004, Wright filed a personal injury lawsuit against the County of Los Angeles (the underlying litigation) in which she was represented by Kingston. Schiffman and SCOP treated Wright for her injuries and, in June 2005, performed two surgeries.

In connection with SCOP's treatment, and at its request, Wright and Kingston signed a document entitled "Medical Lien for Services Rendered" (medical lien). The medical lien stated as follows:

"To: Attorney Paul Kingston, Esq.

    [Address]

"Re: Medical Lien for Services Rendered

"Re: Wright, Karen                Date of Injury: 03-30-04

"I do hereby authorize the above doctor to furnish you, my attorney, with a full report of his examination, diagnosis, treatment, prognosis, etc., of myself in regard to the accident in which I was involved.

"I hereby authorize and direct you, my attorney, to pay directly said doctor such sums as may be due and owing him for medical services rendered to me both by reason of this accident and by reason of any other bills that are due his office and to withhold such sums for any settlement, judgment or verdict as may be necessary to adequately protect such doctor. I hereby further give a lien on my case to said doctor against any and all proceeds of any settlement, judgment, or verdict which may be paid to you, my attorney, or myself as the result of the injuries for which I have been treated or injuries in connection therewith.

"I fully understand that I am directly and fully responsible to said doctor for all medical bills submitted by him for services rendered and that this agreement is made solely for said doctor's additional protection. I further understand that such payment is not contingent on any settlement, judgment, or verdict by which I may eventually recover said fees. I understand that this lien is due and payable in full two years from commencement of service, unless otherwise confirmed in writing, regardless of the status of my case. I further understand that all accounts not being actively paid accrue interest at 1.5% per month.

"Dated: 9-23-04                Patient's Signature: [Karen Wright]

"The undersigned being the attorney of record for the above patient does hereby agree to observe all terms of the above lien, and also agrees to withhold such sums from any settlement, judgment, or verdict as may be necessary to adequately protect said doctor named above. The undersigned also guarantees payment for services rendered by said doctor, unless otherwise confirmed in writing.

3

"Dated: [Blank]      Attorney's Signature: [Paul Kingston]"

Wright's underlying case against the County of Los Angeles went to trial and resulted in a defense verdict. Wright's unpaid medical bills are alleged to exceed $45,000.

## II. The Present Action

On August 28, 2006, SCOP filed a complaint against Kingston and his law partnership, Ellis & Kingston, for breach of contract and common counts.[1] The complaint alleges that, by signing the medical lien, defendants "obligated themselves to pay [Wright's] medical bill . . . in the amount of $45,324.00, and as of June 15, 2006, are refusing and continue to refuse to pay said bill." SCOP filed the operative first amended complaint on January 28, 2008.[2]

### A. *Plaintiff's Case*

The case went to trial in November 2011. SCOP contended that by signing the medical lien, Kingston personally guaranteed payment of Wright's medical bills, whether or not Wright recovered anything in the underlying action. In support, SCOP called two witnesses: Robert Min and Arlan Cohen.

Robert Min (Min), the executive director and general manager of SCOP, testified that Wright was referred to SCOP by Min's wife, chiropractor Simone Min (Simone Min). Wright was first treated at SCOP on September 23, 2004. Min said his office received the signed medical lien from Kingston before Schiffman operated on Wright and, in agreeing to operate on Wright, SCOP relied on the last sentence of the medical

---

[1] According to Kingston, his former law partner, Malcolm Ellis, is deceased and the law partnership no longer exists. Where appropriate, we refer to Kingston and his former law partnership collectively as "Kingston."

[2] Other than an allegation in the first amended complaint that SCOP occasionally operates under the name Southern California Orthopedic Professionals, the allegations of the original and first amended complaints are virtually identical.

4

lien.  Min said that had Kingston not signed the medical lien, SCOP would not have scheduled Wright for surgery.

Arlan Cohen, a physician and lawyer, testified as an expert witness.  In his opinion, the final sentence of the medical lien contained "a separate obligation to pay the doctor which is different from the obligation to set aside funds from settlement in the judgment under the plain language of this document."  The lien represents "an offer here by the doctor to provide services without a current bill in return for promises that his bill will be paid later either by the patient or through settlement or in the final sentence by the lawyer."

Cohen agreed that the word "guarantee" can be "interpreted as a promise."  However, he did not believe that the medical lien could be interpreted to mean that the attorney would guarantee payment only if there were a recovery because "the previous clause . . . talks about payment if there's a recovery.  And this is a separate subsequent statement that says, 'Also.'  . . . When you have three separate obligations in plain English separated by the word 'also' so that in order to believe that the guarantee payment for services rendered by said doctor means only if there's a settlement, that would make the last paragraph — the last two parts of it the same.  That just does not make sense.  It's not the plain English meaning of this document."

Cohen was asked whether, as a practicing lawyer, he had ever paid a doctor despite losing a case, and he said that he had.  He was then asked whether he had ever "guaranteed payment" to a physician.  He responded:  "You bet.  In fact, it's impossible to get an expert witness including an expert witness who's going to give continuing care without signing an agreement that says the lawyer is going to pay for this rather than the patient because they recognize that the patient doesn't have it."  In response to the trial court's questions, Cohen said that he had used similar agreements as a practicing physician, but agreed that "a lot of lawyers would turn this type of agreement down."

## B.    *Defendant's Case*

Kingston testified that his practice for the past approximately 35 years has been predominantly personal injury litigation. When Wright first retained him, she was being treated for her injuries by Simone Min. When Simone Min joined Schiffman's practice, Wright moved with her. About eight months later, Kingston received a lien agreement from Dr. Schiffman's office, which he signed and returned by fax on June 7, 2005. When he signed the lien, Kingston "believed that the lien was requiring my promise to pay for any care [Wright] had had to Dr. Schiffman out of the available funds that were presented in the case by a settlement or verdict, resolution, judgment that might come out of the case. I read the lien. It was a standard lien. It was a typical lien. I signed it with that intent, with that knowledge."

Kingston testified that "[t]o me, the word 'guarantee,' implied, suggested, stated, inferred that I was promising, I was guaranteeing payment out of any proceeds that might be forthcoming and that I never had any intent, none whatsoever, of paying for this personally, of guaranteeing as a guarantor would guarantee any sums that the parties might incur as a result of the practice of the doctor that she had gone to. That was my intent then, it was my understanding then, and my understanding today. There was no language which would indicate to me that I was a personal guarantor of anything. I took my risks on this particular case. I was retained by [Wright] on a contingency fee basis. And the doctor the same way. We both had an expectation which unfortunately didn't work out."

Kingston testified that he never intended personally to guarantee payment of Wright's medical bills. He understood the final sentence of the lien as follows: "That was a variation on the word I promise to pay the lien, this is a medical lien. It would be absurd to think that was anything other than the lien. The language of the whole thing to me was clear. Words change, different words are used, but the meaning is the same, that I promise to pay the bills of my client as generated by the doctor who is providing the health care services for her, but out of any settlement or any award or any judgment that

6

would be obtained from the case. I never considered it otherwise. It seemed clear to me."

Kingston testified that in his 40 years of practice, he had never agreed to pay any client's medical bills if there was no recovery, and he had never seen a medical lien in which any other plaintiff's lawyer had agreed to do so. It was his opinion that it was not typical for a plaintiff's lawyer personally to guarantee payment of a client's medical bills.

Defendants' expert witness, Attorney Dana Hobart, testified that during his years of practice as a personal injury attorney, he had reviewed thousands of medical liens and had lectured on the subject of medical liens. In his opinion, the attorney's portion of the medical lien did not contain a personal guarantee. He explained: "I read this document['s] last paragraph [to] consist[] of essentially three points. One, the attorney taking note of what the directions are from the client up above, that portion [of] the document. Two, it says — the second part says, the attorney also agrees to withhold such payment. And then the third part of it, the so-called guarantee part, says no more than the attorney guarantees to take the withheld money and follow the instructions of the client and pay the money, if any is recovered, to the . . . medical firm." In other words, he said, the final sentence of the attorney portion of the medial lien is simply "an attorney agreeing to follow his client's directive that Dr. Schiffman's office, [which is] the Southern California Orthopedic Professional Office, be paid for its medical bills out of, and contingent upon, there being any recovery."

Hobart said his opinion about the lien's meaning was based, in part, on custom and practice: "I would say that I have never once in 40-some years of practice seen an attempt by a doctor . . . to turn a medical lien into a personal guarantee. . . . It is extremely atypical." He said he also had never seen a case in which a lawyer personally guaranteed a medical lien, and "never had a medical practice ever even ask me if I would personally guarantee my client's bill, not once in 40 years of active practice nobody has even asked me to do that."

In Hobart's opinion, the medical lien was both ambiguous and deceiving if interpreted to contain the attorney's personal guarantee: "[Plaintiff] had the opportunity

7

— if they wanted to make it a personal guarantee, had the opportunity of doing so by having a subsequent paragraph that is headed with capital letters . . . . Nothing draws one's attention to it — to it being a separate clause independent of the lawyer agreeing to follow his client's instruction, which is the way I read this document[.]" Hobart also characterized SCOP's interpretation as absurd: "The absurdity is this: You have a document that's entitled a medical lien. Nobody would anticipate such an absurd result as to take that document and say it constitutes a personal guarantee on the part of an attorney who is pursuing an already very difficult slip and fall case which is costing him immense money and time."

### III. Judgment and Statement of Decision

After the conclusion of testimony, the trial court entered judgment for Kingston. On March 29, 2012, it issued a statement of decision that stated in relevant part as follows:

"A contract must be interpreted in the sense in which the promisee (in this case, Defendants and/or Paul Kingston) relied upon and understood it to be interpreted when Kingston signed it, which intention was for no personal guarantee for payment for Karen Wright's medical bills, but only to pay the medical bills out of some recovered and withheld proceeds of funds through settlement or judgment from Karen Wright's underlying lawsuit.

"Paul Kingston repeatedly testified that, at the time he signed the document, he was unaware of any ambiguity in the alleged contract since he understood the alleged contract to be solely a medical lien and that was his intent when he signed the document. Defendants' expert G. Dana Hobart testified convincingly and in accord with settled law that where there is an ambiguity in the alleged contract, the court must look to the intent of the individual being asked to guarantee the payment, and his intent controls the interpretation of the alleged contract. Such intent by Defendants and/or Paul Kingston was clearly to sign a medical lien only, and not to provide a personal guarantee of payment for Karen Wright's medical bills.

8

"The sentence in the contract: 'The undersigned also guarantees payment for services rendered by said doctor, unless otherwise confirmed in writing' is ambiguous and uncertain. This was clearly demonstrated to the court by the testimony presented, in that different ways of interpreting this sentence did, in fact, occur at the time of the signing of the document and which are now being argued before the court. Had this sentence been in clear and unambiguous language, there would have been only one interpretation, instead of the two interpretations given by Plaintiff and by Defendants. Defendants intended only to contract for a medical lien, and it is now clear that [Plaintiff] intended to simultaneously contract for a medical lien and a personal guarantee for payment of the medical bills by the attorney.

"[Plaintiff] wrote the contract in this case. This was proved by the testimony of Paul Kingston and the Plaintiff's witness, Rob Min, who both testified that [Plaintiff] faxed the alleged contract to Mr. Kingston and asked Mr. Kingston to sign it. It is settled law that any ambiguity or uncertainty in the alleged contract at issue must be held against the entity who wrote the alleged contract, which evidence clearly proved was [Plaintiff], and not Paul Kingston and/or the Defendants. CACI 320.

"In Meyer v. Moore (1925) 72 Cal.App. 367, 'the words "guaranty" or "guarantee" do not always import a contract of guaranty. These words are often used in the sense of promise or agree, etc.,' as was the case in the instant lawsuit, where Defendants and/or Paul Kingston intended to promise to pay the medical lien out of money to be recovered and withheld from proceeds from the underlying lawsuit, if any. [¶] . . . [¶]

"The law regarding interpretation of a contract is set forth in Civil Code sections 1638, *et seq*. and Universal Sales Corporation Ltd. v. California Press Manufacturing Company (1942) 20 Cal.2d 751, 760, and Charles Lemm v. Stillwater Land and Cattle Co. (1933) 217 Cal. 474. Applicable law requires that the court must ascertain the parties' intent in interpreting the contract. This court finds that Paul Kingston's intention was for guaranteeing and/or promising payment of the medical lien to the medical providers, allegedly the Plaintiff, only from funds recovered and withheld from proceeds

9

obtained through settlement or judgment from the underlying lawsuit of Karen Wright. This court finds that, at the time of the formation of the contract at issue in this case, Paul Kingston and/or the Defendants had no intention to personally guarantee or personally promise payment of the medical bills of Karen Wright or to make any payment absent some funds being recovered and withheld for such payment from the settlement or judgment of the underlying lawsuit of Karen Wright. This court finds that there was no meeting of the minds for formation of a contract for personal guarantee of payment between Defendants and/or Paul Kingston and [Plaintiff] and no such contract for personal guarantee by the attorney was formed.

"The only reasonable finding based on the clear lack of a meeting of minds is that there was no personal guarantee for payment of Karen Wright's medical bills by Defendants and/or Paul Kingston to [Plaintiff] by the signature of Paul Kingston upon the contract at issue in this case.

"This court finds that since the underlying lawsuit of Karen Wright resulted in a defense verdict and no money was recovered and withheld from proceeds via settlement or judgment pursuant to this underlying lawsuit, the medical lien between [Plaintiff] and Defendants and/or Paul Kingston was not transformed into a personal guarantee against Mr. Kingston. . . . This court, therefore, finds that the Defendants and/or Paul Kingston do not owe [Plaintiff] any money pursuant to the medical lien." (Fn. omitted.)

Notice of entry of judgment was filed on May 31, 2012. SCOP timely appealed.


**DISCUSSION**


Although SCOP urges that the trial court erred in several ways, each claim of error depends on a single premise: that the medical lien *unambiguously* required Kingston to pay Wright's medical bills, regardless of the outcome of Wright's underlying litigation—or, stated differently, that the medical lien is not reasonably susceptible of the interpretation urged by Kingston, that Kingston promised to pay SCOP only those funds withheld from any settlement or judgment.

10

Because each of SCOP's claims depends on this underlying premise, we begin by considering it. We then turn to SCOP's specific claims of error.

**I.  The Medical Lien Is Ambiguous and Is Reasonably Susceptible of the Interpretation Urged by Kingston**

In interpreting a contract, the threshold question is whether the contract is ambiguous—that is, whether it is reasonably susceptible of more than one interpretation. (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) The question of ambiguity is a question of law subject to independent review on appeal. (*Ibid.*)

"As has often been restated:  '"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.] If contractual language is clear and explicit, it governs. [Citation.] On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.]" [Citation.] "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.]" [Citations.]'  [Citations.]" (*In re Marriage of Hibbard* (2013) 212 Cal.App.4th 1007, 1013.)

The trial court correctly concluded that the attorney portion of the medical lien is ambiguous and is reasonably susceptible of the interpretation urged by Kingston. To repeat, the relevant contractual language is:

"The undersigned being the attorney of record for the above patient does hereby agree to observe all terms of the above lien, and also agrees to withhold such sums from any settlement, judgment, or verdict as may be necessary to adequately protect said

11

doctor named above. *The undersigned also guarantees payment for services rendered by said doctor, unless otherwise confirmed in writing*." (Italics added.)

SCOP urges that the word "guarantee" is unambiguous, and it directs us to Black's Law Dictionary, which SCOP says (without citation) defines "guarantee" as "a promise to answer for the debt of another." The phrase SCOP quotes, however, is the definition[3] of the noun "guaran*ty*," not the verb "guarant*ee*." (Black's Law Dict., *supra*, at p. 712, col. 1.)[4] The verb "guarant*ee*" has a variety of meanings, which include both the meaning SCOP urges ("to make oneself answerable for (something) on behalf of someone else") *and* the meaning Kingston urges ("to promise"), among others. (Random House Webster's College Dict. (1991) p. 593, col. 1.)

The context in which the word "guarantee" appears in the medical lien does not clarify the ambiguity. As both sides correctly note, the attorney's portion of the medical lien contains three discrete provisions—the attorney promises to (1) "observe" the terms of the lien, (2) "withhold" from any settlement, judgment, or verdict sufficient funds to satisfy the lien, and (3) "guarantee[]" payment. In this context, the "guarantee" clause reasonably could mean that the attorney will answer for the payment of the client's debt, as SCOP contends. However, the guarantee clause equally reasonably could mean, as Kingston contends, that in addition to *withholding* the funds necessary to satisfy the lien from any settlement, judgment, or verdict, the attorney promises to *transfer* such funds to the medical provider. We therefore conclude, as the trial court did, that the "guarantee" clause is ambiguous and is reasonably susceptible to the interpretation Kingston suggests.

Having so concluded, we now address SCOP's specific claims of error.

---

[3]    Black's Law Dictionary defines "guaran*ty*" as "[a] promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance." (Black's Law Dict. (7th ed. 1999) p. 712, col. 1.)

[4]    The noun form of the word is alternatively spelled "guaranty" or "guarantee;" the exclusive spelling of the verb form of the word is "guarant*ee*."

12

**II. The Trial Court Properly Admitted Kingston's Extrinsic Evidence**

    *A.    Kingston's Extrinsic Evidence Did Not Vary or Contradict the Lien's Plain Language*

SCOP urges that the trial court erred by admitting Kingston's extrinsic evidence, including of industry custom and practice. SCOP does not identify any particular extrinsic evidence to which it objects, but suggests generally that Kingston should not have been permitted to introduce extrinsic evidence to support his proposed interpretation of the medical lien because such evidence "var[ied] or contradict[ed] the express terms of [the] contract."

"[I]f [an] instrument is reasonably susceptible to the interpretation urged, the court must receive any relevant extrinsic evidence the party puts forth to prove its interpretation. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.)" (*City of Bell v. Superior Court* (2013) 220 Cal.App.4th 236, 248.) A court may consider, among other things, "the meaning ascribed to language as a matter of custom and practice." (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1404.)

As we understand it, SCOP's sole objection to Kingston's extrinsic evidence is that such evidence contradicts the "only one reasonable interpretation to KINGSTON'S personal guarantee." This contention fails because, as we have already said, the lien is reasonably susceptible of Kingston's interpretation: that the medical lien was not a personal guaranty, but rather was a promise to transfer to SCOP any funds Wright recovered from her litigation against the County of Los Angeles that were subject to SCOP's lien. The trial court therefore did not err in admitting Kingston's extrinsic evidence.

    *B.    The Court Was Not Required to Reach a Different Result Because Kingston Is an Experienced Personal Injury Attorney*

Notwithstanding the foregoing, SCOP contends that the trial court should not have admitted Kingston's extrinsic evidence because Kingston is a "sophisticated lawyer" who

13

should be held to "a higher minimum standard of conduct." In support, SCOP quotes *Howard v. Babcock* (1993) 6 Cal.4th 409, 418, for the proposition that the California Supreme Court "has the authority to prescribe rules of professional conduct for attorneys as part of its inherent power to regulate the practice of law. [Citations.] It is in our power to impose a higher standard of conduct on lawyers than that applicable to other professionals. [Citations.]"

While the quoted language is undoubtedly a correct statement of the law, it has no application here. Whatever the Supreme Court's power to impose higher standards of conduct on lawyers, SCOP cites no authority for the proposition that the court has ever exercised that authority to deny an attorney the right to introduce extrinsic evidence to support his or her interpretation of a disputed contract provision. *Howard v. Babcock* itself certainly contains no such rule, as the issue in that case was the enforceability of a covenant not to compete, not the admissibility of extrinsic evidence. We therefore reject SCOP's suggestion that Kingston's status as a lawyer has any bearing on his right to rely on extrinsic evidence in this contract case.


C. *Kingston's Conduct Is Not Inconsistent With His Suggested Interpretation of the Medical Lien*

Citing *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1450 (*Oceanside 84*), SCOP contends that the trial court should not have admitted evidence of Kingston's purported interpretation of the medical lien because Kingston acquiesced in SCOP's interpretation. For the reasons that follow, we do not agree.

In *Oceanside 84*, the parties' dispute centered around the meaning of loan documents—specifically, the meaning of "applicable month." The court found that the interpretations of "applicable month" offered by both parties were reasonable, and the parties had not discussed the meaning of the term before executing the contract. (*Id.* at p. 1449.) It therefore was appropriate to look at "the conduct of the parties after the execution of the contract, and before any controversy arose, . . . in order to attempt to ascertain the parties' intention." (*Ibid*.) The court noted that the lender had consistently

14

interpreted "applicable month" for five years before the dispute arose, and that the borrower was on notice of and did not object to the lender's interpretation. Accordingly, "[borrower] may be considered to have at least acquiesced in [lender's] interpretation of the term 'applicable month.'" (*Id.* at pp. 1450-1451.)

The present case is inapposite. SCOP contends that Kingston's conduct "in failing to protest demonstrates acquiescence in SCOP's view that he guaranteed the medical services," but it offers no evidence that, at any time before the present dispute arose, SCOP acted in accordance with its interpretation of the medical lien and Kingston failed to object. Simply put, therefore, there is no evidence of acquiescence.[5]

### III.    The Trial Court Did Not Improperly Rely on Extrajudicial Resources

At the conclusion of Kingston's cross-examination of plaintiff's expert, Cohen, the trial court asked Cohen some additional questions, as follows:

"The Court:  So, doctor, atypical medical lien?

"The Witness:  No, it's not atypical. It's a single pager with clear demarcations. Plain English. Print small. But aside from that —

"The Court:  I'm not saying it's confusing or saying that. But as far as the last portion, is that atypical?

"The Witness:  No, it is not.

"The Court:  *Now, there are lots of plaintiff's lawyers that work on contingency that work with the same doctors over and over and over again. . . . And they have testified many, many times in this court. And they seem to work off of liens. If nothing is recovered, they don't go after.* Now, that would be because they don't sign these types of agreements or there's a special agreement with the lawyer or perhaps because there's enough cases there will be a recovery that's worth it and they work together.

---

[5]    Because we have concluded that the trial court's interpretation of the medical lien was consistent with its plain language, we need not consider SCOP's argument regarding whether Kingston's evidence entitled him to reform or rescind the agreement.

15

"The Witness: Each one of those is a significant factor. Probably the most important in my experience is the last. . . . I get enough business from this lawyer to make [me] eat the occasional case and still make the arrangement [an] economically feasible one for me. [¶] . . . [¶]

"The Court: This type of agreement you've used this as well?

"The Witness: Yes.

"The Court: As a doctor?

"The Witness: Yes.

"The Court: And I mean it would be fair to say that a lot of lawyers would turn this type of agreement down?

"The Witness: They would. Depend on their evaluation of this case." (Italics added.)

SCOP contends that the italicized statement constitutes an "extrajudicial source coming from [the trial judge's] personal experience," which the court was not entitled to consider. We do not agree. *United States v. Grinnell Corp.* (1966) 384 U.S. 563, 583 (*Grinnell*), the case on which SCOP relies, concerned judicial disqualification—specifically, whether a trial judge should have been disqualified on grounds of bias and prejudice. The Supreme Court held that disqualification was not required in that case, explaining that "[t]he alleged bias and prejudice to be disqualifying [under 28 U.S.C. § 144] must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." (*Id.* at p. 583.)

*Grinnell* has no bearing on the present case. It concerned judicial disqualification, which manifestly is not at issue here. And even if the *Grinnell* standard applied in the present circumstances, we still could not conclude that the trial court erred. The judge's statement makes clear that he had limited experience with medical liens and therefore was seeking information from plaintiff's expert. The fact that the judge phrased his query to the expert in terms of what he had observed in past cases does not suggest that he had already made up his mind on the merits—to the contrary, his statement ("Now,

16

that would be because they don't sign these types of agreements or there's a special agreement with the lawyer or perhaps because there's enough cases there will be a recovery that's worth it and they work together") suggested that he had not.

## DISPOSITION[6]

The judgment is affirmed.  Respondents shall recover their costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, J.[*]

We concur:


EPSTEIN, P. J.


WILLHITE, J.

---

[6]     In December 2013, SCOP moved to strike portions of the respondents' brief and for sanctions; Kingston opposed both motions and sought sanctions against SCOP and its attorney for filing frivolous motions.  We deny the motion to strike and all parties' requests for sanctions.

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.