Filed 7/3/25  Meyerson v. Verb Technology Co. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| AARON MEYERSON,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VERB TECHNOLOGY COMPANY, INC.,<br><br>Defendant and Appellant. | B334777<br><br>(Los Angeles County Super. Ct. No. 19STCV41816) |

APPEAL from judgment of the Superior Court of the County of Los Angeles, Laura A. Seigle and Thomas D. Long, Judges.  Affirmed.

Sterrett Law, Daniel Sterrett, for Defendant and Appellant.

Kaizen Law, Christopher C. Todd, for Plaintiff and Respondent.

This is an action for breach of an employment agreement between plaintiff and respondent Aaron Meyerson and bBooth, Inc. (bBooth), the predecessor of defendant and respondent Verb Technology Company, Inc. (Verb). bBooth terminated Meyerson without paying him the full amount of what the agreement describes as a "guaranteed bonus." Verb alleged that Meyerson waived his right to such a bonus by consenting to a release of claims in a subsequent stock repurchase agreement with bBooth. The trial court granted summary adjudication in favor of Meyerson on Verb's affirmative defense of waiver. A bench trial focused on whether bBooth's obligation to pay the guaranteed bonus was subject to an unsatisfied condition precedent—the company's attainment of "available free cash flow." The trial court found there was no condition precedent and entered judgment for Meyerson. In this appeal, Verb challenges the order granting summary adjudication of the waiver defense and the trial court's finding that bBooth breached the employment agreement. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Employment Agreement and Meyerson's Termination From bBooth

bBooth was in the business of building recording booths that were to be installed at shopping malls around the country, allowing performers to record performances for television auditions. In August 2014, Meyerson and bBooth executed an agreement (Employment Agreement) pursuant to which Meyerson would be the company's president. bBooth's CEO, Rory Cutaia, signed the agreement on behalf of bBooth.

Section 5.2 of the Employment Agreement describes several types of bonuses: discretionary "annual" and "additional" bonuses and the "guaranteed bonus" that is the subject of this appeal. The relevant part of section 5.2 states:

> In addition to the incentive based bonuses above, [Meyerson] will be paid the following guaranteed bonus:
>
> > (a) upon signing this Agreement, $25,000, receipt of which is hereby acknowledged by [Meyerson];
> >
> > (b) upon the effective date of [bBooth] becoming [a] publicly traded company through the reverse take-over transaction currently contemplated (the 'RTO'), $25,000;
> >
> > (c) subject to available free cash flow, as determined by the CEO in good faith, the following additional sums:
> >
> > > i. $50,000 on or before December 31, 2014, and $50,000 each quarter thereafter until the total sum of $277,460 in guaranteed bonus has been paid.
>
> However, if [Meyerson's] employment with [bBooth] is involuntarily terminated for any reason (Termination For Cause, Termination without Cause, Termination For Good Reason, or in the event of

Death or Disability), then the entire unpaid
guaranteed bonus shall be paid upon termination. [1]

The Employment Agreement also provides for Meyerson to receive equity in bBooth.

In 2015, bBooth offered its employees a reduction in salary in exchange for continued employment while its officers and directors pursued financing opportunities. Though Meyerson did not consent in writing to such a reduction, bBooth paid him only half of his salary for several pay periods between March and May 2015. In mid-2015, bBooth involuntarily terminated Meyerson.[2] It had only paid him $50,000 of the $277,460 guaranteed bonus.

## B.  The Stock Repurchase Agreement

In January 2016, the parties executed a Stock Repurchase Agreement (Repurchase Agreement) whereby bBooth agreed to purchase 7.2 million shares of the company's common stock from Meyerson (the Shares) for $144,000. Relevant to this appeal, Meyerson released claims "arising out of the original grant" of the Shares.

## C.  Meyerson's Complaint and Summary Judgment Motion

Meyerson filed this action in 2019. His operative first amended complaint asserted a single cause of action for breach of

---

[1]     We reproduce the provision in a manner that shows the original numbering, indentations, and paragraph breaks.

[2]     The parties stipulated that Meyerson's termination was an involuntary "Termination for Good Reason," as that term is defined in section 2.6 of the Employment Agreement.

the Employment Agreement against Verb as bBooth's successor in interest.[3] Meyerson alleged he was owed the unpaid balance of the guaranteed bonus ($227,460), and other amounts. Verb's answer asserted numerous affirmative defenses.

Meyerson moved for summary judgment on his first amended complaint, or in the alternative, for summary adjudication of several of Verb's affirmative defenses, including its defenses of waiver and failure of a condition precedent. The trial court denied summary judgment but granted summary adjudication as to the waiver defense, among others. It rejected Verb's argument that the Repurchase Agreement's release barred Meyerson's claim for breach of the Employment Agreement.

As for failure of a condition precedent, Verb argued that payment of the guaranteed bonus was conditioned on "available free cash flow" (§ 5.2(c)), which bBooth never achieved. Meyerson argued that the final paragraph of section 5.2, which required the "entire unpaid guaranteed bonus" to be paid upon his involuntary termination, superseded the condition. The court found section 5.2 to be reasonably susceptible to both interpretations and denied summary adjudication of the defense.

## D.    Trial and Judgment

A bench trial was conducted in 2023 before a different judge. Trial focused on whether "available free cash flow" was a condition precedent to the obligation to pay the guaranteed bonus upon Meyerson's termination. The Employment Agreement was admitted into evidence by stipulation, and the parties further

---

[3]    bBooth became Verb as the result of mergers and name changes, and Verb succeeded to bBooth's obligations under the Employment Agreement.

stipulated that it was "valid and enforceable" against Verb. They also stipulated that bBooth's failure to pay salary and severance pay breached the agreement.

Meyerson testified that Cutaia, a lawyer, drafted the Employment Agreement. The "guaranteed bonus" was accrued salary that Meyerson earned for consulting work he performed for Cutaia in 2013 and 2014, and Meyerson communicated his unwillingness to sign a new agreement unless they agreed on payment of that salary. They agreed to "roll that [accrued salary] up" into the Employment Agreement. Meyerson performed a calculation, and the parties settled on $277,460 as the guaranteed bonus amount. They agreed it would be paid "when the company could" afford it, unless Meyerson were terminated. Doing otherwise "would set up a perverse incentive" for bBooth to fire Meyerson to avoid the payment. Section 5.2's final paragraph reflects their intent that, if bBooth involuntarily terminated him, even for "doing something horrible," it would still owe the guaranteed bonus.

Cutaia testified that he engaged Meyerson as a consultant in 2013 but could not afford to pay what Meyerson was then earning as a television executive at CBS. They agreed to calculate the "differential" between Meyerson's CBS salary and what the company could afford to pay, "keep track of it," and when bBooth became profitable, it would "take care of" payment.

Cutaia testified that by early 2014, he was communicating with potential investors, but they would not agree to payment of accrued salary to Meyerson until bBooth became profitable. According to Cutaia, the term "guaranteed bonus" was used in the Employment Agreement to indicate that, once bBooth became cash flow positive, Meyerson would be paid even if he were fired.

6

Thus, all payments of the guaranteed bonus, including the payment upon involuntary termination, were subject to the availability of "free cash flow," which he defined as "money left over" after bBooth paid its bills. bBooth did not achieve positive cash flow.

The trial court found that the "guaranteed bonus" consisted of $25,000 paid to Meyerson upon the signing of the Employment Agreement (§ 5.2(a)), $25,000 paid upon bBooth's becoming a publicly traded company (§ 5.2(b)), and $227,460 as provided in subdivision (c). The court found that the obligation to pay the "entire unpaid guaranteed bonus" upon Meyerson's involuntary termination was not subject to the condition of "available free cash flow" described in subdivision (c)(i). The trial court entered judgment in favor of Meyerson, which included an award of the unpaid balance of the guaranteed bonus, $227,460.

Verb appealed from the judgment.

## DISCUSSION

### A.   Summary Adjudication of Verb's Waiver Defense

Verb, opposing summary adjudication of its waiver defense, argued that Meyerson released his breach of contract claim by signing the Repurchase Agreement. That agreement states that, except for certain rights not at issue in this appeal, "the Stockholder . . . does hereby remise, release and forever discharge [bBooth] . . . of and from all claims [and] causes of action . . . arising out of the original grant . . . of the Shares." Cutaia, in a declaration, attested that the shares described in the Repurchase Agreement were the same as those Meyerson received as part of the Employment Agreement, and that some of the $144,000 repurchase price was in return for his releasing claims against

7

bBooth. According to Cutaia, Meyerson "objected to a broad release of any and all claims," so they "compromised on just those claims arising under his employment agreement, pursuant to which he received the 'original grant' of his bBooth Shares . . . ."

The trial court found Meyerson carried his burden of showing that he did not waive his breach of contract cause of action. The Repurchase Agreement did not contain a general release and was limited to claims arising out of the grant and repurchase of the Shares. The court rejected Verb's interpretation of the release, finding the phrase "'arising out of the original grant' cannot be reasonably interpreted to mean 'arising out of the Executive Employment Agreement.'"

On appeal, Verb argues that the trial court erred by ignoring and misconstruing the evidence of the parties' understanding of the release and by failing to review the evidence in the light most favorable to Verb.

1.    *Governing Law*

"Summary adjudication of an affirmative defense is properly granted when there is no triable issue of material fact as to the defense, and the moving party is entitled to judgment on the defense as a matter of law." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 977–978 (*Kendall-Jackson*); see Code Civ. Proc., § 437c, subd. (f)(1).) The moving plaintiff has the burden of showing there is no evidence to support the defense. (*Kendall-Jackson, supra,* 76 Cal.App.4th at p. 978.) Once the plaintiff has met that burden, the burden shifts to the defendant to set forth specific facts showing a triable issue of material fact exists as to the defense. (*Ibid.*) "'The applicable standard of review of a grant of summary adjudication of issues is

8

the de novo standard.' [Citation.]" (*Tilley v. Schulte* (1999) 70 Cal.App.4th 79, 82.) "We construe [the plaintiff's] papers strictly and [the defendant's] liberally and resolve any doubts as to the propriety of granting the motion in favor of [the defendant]." (*Kendall-Jackson, supra,* 76 Cal.App.4th at p. 978.)

"We interpret a release . . . under the same rules of construction that apply to contracts generally. [Citations.] We interpret a contract to give effect to the mutual intention of the parties at the time they formed the contract. [Citations.] We discern the parties' intention based on the written contract alone, if possible, but may also consider the circumstances under which the contract was made and its subject matter." (*Camacho v. Target Corp.* (2018) 24 Cal.App.5th 291, 306; Civ. Code, § 1639.) To be enforceable, the language of a release must be "'"clear, explicit and comprehensible in each of its essential details. Such an agreement, read as a whole, must clearly notify the prospective releasor . . . of the effect of signing the agreement."'" [Citation.]" (*Diamond v. Schweitzer* (2025) 110 Cal.App.5th 866, 880 (*Diamond*).)

We first determine if a release contains an ambiguity. (*Diamond, supra*, 110 Cal.App.5th at p. 880.) If the court concludes that the release is not reasonably susceptible to a party's interpretation, the analysis ends. (See *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 (*Oceanside*) ["[T]he first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over." [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean?"].)

9

"Whether the provisions of a contract, including a release, are clear and unambiguous is a question of law, not of fact." (*Diamond, supra*, 110 Cal.App.5th at p. 880.) "Consequently, we conduct an independent review to determine whether the release is ambiguous." (*Id*. at pp. 880-881.)

2.    *Analysis*

Verb's contentions of error focus on the evidence presented to the trial court concerning the meaning of the release, but it fails to address the first step of contract interpretation: whether the release is reasonably susceptible to more than one interpretation. It is not.

The release is narrow in scope. It states that Meyerson releases only claims arising from the "original grant" of the Shares, with no mention of other claims that might arise from the Employment Agreement. Indeed, the Repurchase Agreement does not mention the Employment Agreement or an employment relationship anywhere, and it refers to Meyerson as the "Stockholder," not as an employee or as "Executive," as he is called in the Employment Agreement. Though it was uncontested that Meyerson received the "original grant" of the Shares as part of his compensation under the Employment Agreement, it does not follow that a release of claims arising from that grant waives all other rights. The grant of equity was but one of many rights the Employment Agreement conferred on Meyerson, which also included indemnification, salary, three kinds of bonuses, expense reimbursement, and other benefits. The Repurchase Agreement does not suggest that Meyerson would forfeit these rights by signing it and accepting the purchase price, and accordingly, cannot reasonably be read as a

10

clear, explicit, and comprehensible waiver of these rights. (*Diamond, supra,* 110 Cal.App.5th at p. 880.)

We conclude that the release is not ambiguous. The trial court was not required to conduct the second step of interpretation and consider evidence of the release's meaning. (See *Oceanside, supra,* 56 Cal.App.4th at p. 1448.) It was correct in finding that Meyerson did not release his claim for breach of the Employment Agreement's guaranteed bonus provision. It properly granted summary adjudication of the waiver defense.

## B. Failure of Condition Precedent

Verb argues that the trial court erred in two ways when it found in favor of Meyerson on his breach of contract cause of action. Verb contends it was error to find that bBooth's obligation to pay the guaranteed bonus was not subject to the condition of "available free cash flow." Verb further asserts that, because the trial court denied Meyerson's motion for summary judgment based upon ambiguity in the guaranteed bonus provision, it was bound at trial to find no meeting of the minds and no contractual obligation to enforce. We conclude that the language of the contract is unambiguous, enforceable, and required the payment of the full guaranteed bonus to Meyerson.

### 1. *Governing Law and Standard of Review*

"[P]arties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event." (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313 (*Platt*), citing Civ. Code, § 1434; see also Civ. Code, § 1439.) Such a condition is referred to as a "condition precedent," which "must be performed . . . before the contractual right accrues or the

11

contractual duty arises." (*Platt, supra*, 6 Cal.4th 307 at p. 313.) Generally, a party's failure to perform a condition precedent will preclude an action for breach of contract. (See *Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 205.) "The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract." (*Id.* at p. 199.)

The trial court, in denying summary adjudication of the condition precedent defense, found the last paragraph of the Employment Agreement's section 5(c) to be ambiguous, and a trial was conducted to determine that provision's meaning. We are not bound by the trial court's threshold ambiguity finding, and its ruling is a question of law subject to independent review. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).)

2.    *Analysis*

In reviewing the Employment Agreement, we do not consider the relevant provision in isolation but consider the agreement "as a whole and interpret the language in context . . . ." (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245, citing Civ. Code, § 1641.) We also "interpret words in a contract in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage." (*Westrec Marina Management, Inc. v. Arrowood Indemnity Co.* (2008) 163 Cal.App.4th 1387, 1392, citing Civ. Code, § 1644.) "If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs." (*Ibid.*, citing Civ. Code, § 1638.)

12

A. Section 5.2's Guaranteed Bonus Provision Is Not Subject to a Condition Precedent

Section 5.2's second paragraph states that Meyerson "will be paid" the "following guaranteed bonus," and three numbered subdivisions follow. The ordinary meaning of a "guarantee" is "'an agreement by which one person promises to make another secure in the possession, enjoyment, or the like, of something.'" (*People v. Kiperman* (1977) 69 Cal.App.3d Supp. 25, 30, quoting Webster's New Internat. Dict.) It was uncontested that the "guaranteed bonus" amount was unpaid salary that had accrued under an earlier consulting arrangement. Thus, the term "guaranteed" indicates that the parties intended to secure Meyerson's right to recover the unpaid salary.

This purpose is underscored by the parties' use of the phrase "will be paid" to describe bBooth's duty to pay the bonus. The choice of phrase is significant because the parties demonstrated elsewhere that they knew how to attach conditions to bBooth's obligation to make a bonus payment. In the immediately preceding paragraph concerning incentive-based bonuses, the parties stated that Meyerson merely "will be eligible" to receive such bonuses if certain requirements are met (e.g., Meyerson's attaining Board-approved "performance targets" for himself and bBooth's attaining "EBITDA targets"[4] and other budget and performance objectives). By stating that the guaranteed bonus "will be paid," the parties indicated that payment is mandatory, rather than conditional.

---

[4] "EBITDA" is an acronym for earnings before interest, taxes, depreciation, and amortization. (See *Forty-Niner Truck Plaza, Inc. v. Union Oil Co.* (1997) 58 Cal.App.4th 1261, 1269.)

The "guaranteed bonus" is described in three numbered paragraphs, each of which sets forth an amount and a deadline. Subdivision (a) provides for a $25,000 payment "upon signing this Agreement," and subdivision (b) provides for a $25,000 payment upon the "effective date of [bBooth] becoming publicly traded . . . ." The disputed condition precedent is found in subdivision (c), which states that "the following additional sums" are "subject to available free cash flow." What then follows is a single subparagraph stating $50,000 is to be paid by December 31, 2014, and $50,000 is to be paid each quarter thereafter until the total sum of $277,460 had been paid.

Section 5.2 concludes with the following freestanding paragraph: "However, if [Meyerson's] employment with [bBooth] is involuntarily terminated for any reason (Termination For Cause, Termination without Cause, Termination For Good Reason, or in the event of Death or Disability), then the entire unpaid guaranteed bonus shall be paid upon termination." This paragraph is not a subparagraph of subdivision (c), indicating that it is a not one of the "additional sums" that are "subject to available free cash flow." (See *California State Auto. Assn. Inter-Ins. Bureau v. Antonelli* (1979) 94 Cal.App.3d 113, 120 [policy's layout made it "quite clear" that each part is "designed to stand by itself"].) To the contrary, the new paragraph begins with "[h]owever," indicating that it applies regardless of any condition expressed in subdivision (c). There is no suggestion that the obligation is discharged if bBooth fails to achieve "available free cash flow" by the termination date.

Accordingly, we conclude that "available free cash flow" is a condition that applies only to the installment and quarterly

payments of the guaranteed bonus described in subdivision (c)(i).[5] The final paragraph of section 5.2 expressly exempts from this condition bBooth's obligation to pay the "entire unpaid guaranteed bonus" upon Meyerson's involuntary termination. This language is not ambiguous, and the trial court did not err in rejecting Verb's interpretation.

Even if we were to assume section 5.2 is ambiguous, substantial evidence supports the trial court's interpretation. When an agreement is ambiguous, parol evidence is properly admitted to construe it. (*Winet*, *supra*, 4 Cal.App.4th at pp. 1165-1166.) "When the competent parol evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence." (*Id.* at p. 1166; see *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 530-532.) We construe any ambiguity against the drafter of the Employment Agreement, in this case, bBooth. (See *Hunt v. Superior Court* (2000) 81 Cal.App.4th 901, 909.)

At trial, Cutaia conceded that the guaranteed bonus was intended to compensate Meyerson for past consulting work, and the parties stipulated to the amount Meyerson was owed. Meyerson testified that the parties used the term "guaranteed" to ensure his recovery of the unpaid compensation should he be fired. As Meyerson explained, if positive cash flow were a condition to payment of the guaranteed bonus upon his termination, bBooth, as it neared positive cash flow, would have

---

[5]     Verb is incorrect that this interpretation renders the "available free cash flow" condition a nullity. It relieved bBooth of its obligation to pay the December 2014 and quarterly installments of the guaranteed bonus.

had a "perverse incentive" to terminate him to avoid payment. The trial court could reasonably infer from this evidence that the parties intended for bBooth to pay the guaranteed bonus after involuntarily terminating Meyerson, regardless of its cash flow status at the time.

> B. bBooth's Duty to Pay the Guaranteed Bonus Was Not Altered by the Termination Provisions

Verb argues that the meaning of section 5.2 is different if the Employment Agreement's Termination provisions (sections 6.0, et seq.) are also considered. Because the parties stipulated that Meyerson's separation was a Termination for Good Reason, section 6.3 governed his termination. That section provides, in relevant part, that "[u]pon termination pursuant to this Section 2.6, [Meyerson] shall be entitled to the following benefits (the 'Good Reason Severance Package'): [Meyerson] shall receive (i) 3 months pay at Executive's then current salary and (ii) reimbursement for COBRA health insurance costs for 6 months." Verb argues that if the parties had intended for the guaranteed bonus to be paid upon Meyerson's termination, the bonus would have been mentioned in section 6.3. We disagree.

Section 6.3 contains neither language suggesting that the Good Reason Severance Package is an exhaustive list of the compensation due upon Meyerson's termination, nor any terms relieving bBooth from having to pay amounts owed to Meyerson under other sections of the agreement. Rather, section 6.3 describes what must be paid to Meyerson upon termination, apart from amounts owed under other provisions of the Employment Agreement.

To the extent that extrinsic evidence is needed to interpret the language in section 6.3, Verb confirmed its meaning at trial. Verb conceded that if available cash flow had been attained at the time of termination, bBooth would have been obligated to pay Meyerson's guaranteed bonus, even though it is not mentioned in section 6.3. Verb also stipulated that because bBooth failed to pay salary owed to Meyerson under the Employment Agreement between March 1 and May 15, 2015, it owed him $32,812.50. Past due salary was not among the items listed in section 6.3. This confirms that section 6.3 did not provide an exclusive list of all amounts due to Meyerson upon termination.[6]

---

[6] Implicit in our conclusion that the Employment Agreement required bBooth to pay the entire unpaid guaranteed bonus upon Meyerson's termination is our rejection of Verb's argument that an ambiguity rendered the agreement unenforceable for lack of mutual assent.

17

## DISPOSITION

The judgment of the Superior Court is affirmed.  Meyerson shall recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MORI, J.


We concur:


COLLINS, Acting P. J.


**GARCIA UHRIG, J.

---

** Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.